Nick Beduhn WSB# 6-3763
P.O. Box 1149
Buffalo, WY 82834
307-899-2338
nick.freedomfighter@gmail.com

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Grace Smith, Andy Smith, Shelta Rambur, | ) | |
| Tiffany Leimback, Tamara Weaver,  Renee | ) | |
| Buchli, Carliegh Boucher, Jessica McComb, | ) | |
| Bobbi Dockins, Candi Kusler, Laura Pavey, | ) | |
| and others similarly situated, | ) | |
| Petitioners | ) | |
| | ) | |
| vs | ) | Case No. _____ |
| | ) | |
| Governor Gordon in his official capacity, | ) | |
| Wyoming Dept. of Health, State health officer | ) | |
| Alexia Harrist MD in her official capacity, | ) | |
| Wyoming Dept. of Health interim  director | ) | |
| Stefan Johansson in his official capacity, | ) | |
| Superintendent Craig Dougherty and | ) | |
| Trustees of Sheridan County School | ) | |
| District#2 Superintendent Jubal Yennie and | ) | |
| Trustees of Albany County School District#1 | ) | |
| Superintendent Dr. Margaret Crespo and | ) | |
| Trustees of Laramie County School District#1, | ) | |
| Superintendent Ryan Kramer and Trustees of | ) | |
| Goshen County School District#1, | ) | |
| Superintendent Craig Barringer and Trustees | ) | |
| of Sweetwater County School District #2 | ) | |
| Superintendent: Kent Stokes and Trustees of | ) | |
| Unita County School District#6,Sheridan | ) | |
| Police Department, each of the following | ) | |
| health officers in their official capacity for the | ) | |

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

respective counties: Albany: Jean Allais MD., )
Johnson: Mark Schueler MD, Laramie:        )
Stanley Hartman MD, Goshen: Ted Church,     )
MD.: Sweetwater: Jean Stachon, MD,          )
Jane/John Does 1-100,                       )
                        Respondents         )

---

## COMPLAINT,  MOTIONS FOR PRELIMINARY INJUNCTION AND, DECLARATORY JUDGMENT, AND DEMAND FOR A JURY TRIAL

---

COMES NOW the Petitioners on behalf of themselves and their minor children by and through their attorney, Nick Beduhn, individually and together and on behalf of others similarly situated for their causes of action against the Respondent Gordon et. al. for fraud[1] and for declaratory and injunctive relief from enforcement of any and all

---

1 FRAUD BY GOVERNMENT

Fraud in its elementary common law sense of deceit - and this is one of the meanings that fraud bears in the statute, see United States v. Dial, 757 F.2d 163, 168 (7th Cir. 1985) - includes the deliberate concealment of material information in a setting of fiduciary obligation. A public official is a fiduciary toward the public, including, in the case of a judge, the litigants who appear before him, and if he deliberately conceals material information from them he is guilty of fraud. McNally v. U.S., 483 U.S. 350, 371-372 (1987), Quoting U.S. v. Holzer, 816 F.2d. 304, 307.

Fraud is generally defined in the law as an intentional misrepresentation of material existing fact made by one person to another with knowledge of its falsity and for the purpose of inducing the other person to act, and upon which the other person relies with resulting injury or damage. Fraud may also be made *by an omission or purposeful failure to state material facts*, which nondisclosure makes other statements misleading.

Constructive fraud is considered fraud under the law although deceptive intent is missing because it has the same consequences as an actual fraud would have. It is a finding *imposed in the interest of fairness and justice, such as to prevent violation of a public or private trust or confidence, the breach of a fiduciary duty, or the use of undue influence*.

Black's law dictionary defines constructive fraud as "all acts, omissions, and concealments involving breach of equitable *or legal duty, trust or confidence*, and resulting in damage to another, 38 Cal Rptr.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Executive and health orders issued regarding the SARP-CoV-2 virus (hereinafter Covid-19) which has resulted in many and repeated violations of State and federal law and of the rights and liberties of the Petitioners secured by both the State and federal Constitutions until at full trial can be held.

To that end, and as set forth infra, Petitioners seek a declaratory judgment vacating, voiding, and annulling the emergency declaration orders of Respondent Gordon, and all other orders, policies, requirements and mandates that are based thereon; and an injunction prohibiting Respondents from enforcing the same arbitrary orders.

### Jurisdiction and Venue

This civil rights action raises federal questions under the United States Constitution, the Constitution for the State of Wyoming, and under federal law, particularly 42 U.S.C. § 1983. This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 and 1343. This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.  This Court has authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2002, the requested injunctive relief under 28 U.S.C. § 1343, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events or omissions giving rise to these claims occurred in this district and the Plaintiffs and

---

148, 157; i.e. no scienter is required. Thus the party who makes the misrepresentation need not know that it is false.'"

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Defendants resides in this district.

## Introduction

"Science can flourish only in an atmosphere of free speech."
Albert Einstein,  Science and Dictatorship

"Of all tyrannies, a tyranny sincerely exercised for the good of its victims may be the most oppressive. It would be better to live under robber barons than under omnipotent moral busybodies. The robber baron's cruelty may sometimes sleep, his cupidity may at some point be satiated; but those who torment us for our own good will torment us without end for they do so with the approval of their own conscience. They may be more likely to go to Heaven yet at the same time likelier to make a Hell of earth. This very kindness stings with intolerable insult. To be "cured" against one's will and cured of states which we may not regard as disease is to be put on a level of those who have not yet reached the age of reason or those who never will; to be classed with infants, imbeciles, and domestic animals."
C.S. Lewis, God in the Dock: Essays on Theology, 1948[2] [3]

1. The founders of this country, as expressed in the United States Constitution, which was ratified in 1788; and then more recently in the Constitution for the State of Wyoming, set out the basic principles[4] of our republican[5] government that have withstood the test of time.

2. While there have been occasional deviations from those sacred principles over

2 Authoritarianism Pandemic is the Real Threat  http://www.ronpaulinstitute.org/archives/featured-articles/2021/september/06/authoritarianism-pandemic-is-the-real-threat/
3 Will you, too, turn your neighbors in to our overlords? (Using Covid -  America has been infected with collectivism and corporate authoritarianism)  https://www.wnd.com/2021/09/will-turn-neighbors-overlords/
4 Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority. Article 1 § 7, Constitution for the State of Wyoming
5 Article IV § 4, Constitution of the united States

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

the past 233 years (e.g. *Dredd Scott* determination that African Americans could not be citizens, the *Korematsu* holding justifying the Japanese internment camps during World War II, and forced sterilization in *Buck v. Bell*, to name a few), each branch of government, the executive, legislative and judiciary, have performed their respective functions as they are Constitutionally required to do.

3. Over 110 years ago, at a time when medicine was not yet sufficiently advanced to have developed penicillin and the germ theory of medicine was still new, the Supreme Court of the United States made a ruling related to a citizen's rights in healthcare that has remained largely unaddressed to this day. Over the century plus of time that has since passed the court has decided many critical cases revolving around individual rights that have never been squared with Jacobson. *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

4. A century ago many of our most sacred and fundamental rights were still being sorted out. Suffrage had not yet occurred, civil rights barely existed, critical cases on fundamental rights such as interstate travel and bodily privacy[6] had not come into play and the administrative state that we live in today simply did not exist.

5. Today, under the guidance of an unelected administrative structure, many of the rights our Supreme Court has determined are fundamental under our Constitution are

---

6 A Brief History of the Law of Personal Privacy and Bodily Integrity
https://www.lewrockwell.com/2021/10/andrew-p-napolitano/a-brief-history-of-the-law-of-personal-privacy-and-bodily-integrity/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

being denied. These fundamental rights are being denied, not out of prudence; they are being denied due to unfounded fear and intentional manipulation.[7] So successful is this manipulation that even our Chief Justice, the Honorable Justice Roberts, was misled in a recent decision.

6. But all is not lost. In its wisdom, the *Jacobson* court made clear that it never intended its decision to bar further review. To the contrary, the Court in *Jacobson* specifically stated:

> "Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe -- perhaps to repeat a thought already sufficiently expressed, namely -- that the police power of a State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." (Id, 197 US 38)

7. Unfortunately, and incredibly, with the appearance of the COVID- 19 virus in

---

7 Dr. Ngozi Ezike - Director Illinois Department of Public Health – explained what it means to die "of" COVID. A clip of the press conference found on Redstate shows her making this incredible statement: "The case definition is...is...very simplistic. It means at the time of death...uhm...it was **a COVID positive diagnosis. So that means if you were in hospice and had already been given, you know, a few weeks to live, and then you were also found to have COVID that would be counted as a COVID death. It means that if...uhm...technically even if you died of a clear alternate cause but you had COVID at the same time it's still listed as a COVID death. So, uhm, everyone who is listed as a COVID death doesn't mean that that was the cause of the death but they had COVID at the time of death**." Nick Arama, Watch: Illinois Explains What Qualifies as a 'COVID Death', (April 25, 2020) https://www.redstate.com/nick-arama/2020/04/25/watch-illinois-explains-what-qualifies-as-a-Covid-death/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

early 2020, the basic principle of separation of powers has seemingly vanished.[8],[9],[10] Throughout this country, and indeed throughout the world, the legislative and judiciary[11] branches have stepped back and allowed the executive branch at all levels of government to assume sole control of both executive and legislative governmental functions when it concerns the coronavirus and the COVID-19 pandemic, and has unconstitutionally taken fundamental decision-making away from the individual.[12]

      8. People have been deprived of the right to make decisions about their own health, and that of their children: they can no longer use their judgment and apply the advice of their personal physicians respecting their health, and that of their children.[13]

---

8 A Masked Society Is a Slave Society  https://www.lewrockwell.com/2020/12/gary-d-barnett/a-masked-society-is-a-slave-society/

9 A Pandemic Does Not Suspend the Rule of Law - Courts are beginning to recognize that public health powers, while broad, are not a blank check. - https://reason.com/2020/05/20/a-pandemic-does-not-suspend-the-rule-of-law/

10 Justice Bradley, Wisconsin Legislature v. Andrea Palm, No. 2020AP765-0A.rgb, May 13, 2020, pgs 40-41.

11 COVID-19 Court Operation Updates https://www.courts.state.wy.us/coronavirus-Covid-19-updates/
12 Government Seized Control of the Medical Profession https://wyomingtransparency.com/government-seized-control-of-the-medical-profession/

13 The Privilege to Think - -
Does not apply to you.  The privilege to think, that is.  You're also not allowed to see - to be aware - to pay attention - to search for the truth.
Nope.  You do not have those privileges.  I do not have those privileges.  Hell, they are not even "Rights" if you really stop and think about it.  Well, OK don't *stop and think* about it, but you can at least fleetingly, thoughtlessly consider, where in the U.S. Constitution it says you have the right to think or the right to see/look/be aware?
Can't find it?  ***Exactly***.  No where in the U.S. Constitution does it say we have the right to think or see. It's not in the Wyoming Constitution either.  Therefore, thinking and seeing must be privileges granted by the government.  Privileges that are only bestowed (licensed) upon an upper echelon of hand-picked unofficial officials.
This is what we call "sheep logic", which requires subliminal faith in totalitarian narratives.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

The government has unlawfully and unconstitutionally seized control of such common law and Constitutionally protected rights. See Exhibits 1, 2, and 3 attached hereto and incorporated herein as though set forth in full.

9. Trying to surmise how and why this has occurred includes consideration of the following issues: (1) the exaggerated fear of death fueled by politicians and propagandized by irresponsible media;[14] (2) the complexity of the science and medicine involved which many of our citizens, legislative bodies, and even the judiciary <u>are not taking the time necessary to properly understand</u>: and (3) the irrational and elusive goal of ***completely*** eliminating the virus ***at any cost***, including economic devastation, physical and psychological scarring to millions of our innocent populace, and the loss of the personal freedoms that our forefathers and their successors *gave their lives* to preserve and protect. It is as if mankind has not experienced and survived over thirty (30) pathogenic outbreaks of such diseases as smallpox, cholera, typhoid and others with far higher mortality rates than COVID-19, educating the public, but leaving it to people to decide for themselves what measures to take, and allowing commerce to continue

---

If you are caught thinking and/or seeing/searching for truth without license, you will be publicly indicted. It's far worse than "the thought police" from the Minority Report (with Tom Cruise), because it isn't about *what* you think - ***it's if you think at all.***

Publicly indicted for thinking and paying attention. We see this happen everyday - Facebook and Twitter being the primary killing fields. This is why there are noticeable flocks of human sheeple now. They already learned their lesson, or were taught at an early age, to not think; and to not pay attention so they don't get on the wrong side of privileged thinkers.

14  See footnote 5 supra.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

unfettered. The Petitioners in this action are urging this Court for the reasons set out below, to set aside all policies and mandates requiring the use of face-coverings, social distancing, testing, the quarantining, and forced vaccination of healthy and asymptomatic individuals for all school children, visitors, teachers and administrators.

10. As set forth with more particularity below, the reasons for this action include, but are not limited to:

1) There is no medical emergency that justifies the use of the Respondents' policies requirements/mandates as it applies to Pre-Kindergarten through Twelfth Grade:

2) The remedy requiring the use of face-coverings, social distancing, testing or the quarantining for all students, teachers, staff and visitors does not accomplish the stated goal.

3) The Respondents' policies requirements/mandates regarding the use of face-coverings for all students, teachers, staff and visitors as it applies to Pre-Kindergarten through Twelfth Grade does not accomplish a governmental interest.

4) The remedy requiring the use of face-coverings, social distancing, testing or the quarantining for all students, teachers, staff and visitors, are, and have been arbitrarily made and enforced without any creditable basis in science.

5) The remedy requiring the use of face-coverings, social distancing, testing or the quarantining for all students, teachers, and staff are violations of constitutionally secured and protected fundamental rights.

6) Health emergencies do not warrant coercion that is indiscriminate, overbroad, excessive, or without creditable evidentiary support. The Respondents' policy requirements/mandates regarding the use of face-coverings, social distancing, testing or the quarantining of healthy and asymptomatic individuals are not  based on the best available creditable scientific evidence.

**Facts of The Case**

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Petitioners, individually and together alleges that:

11. On March 13, 2020 Respondent Gordon arbitrarily declared a State of Emergency for the entire State of Wyoming via an Executive Order (EO hereinafter) attached hereto as Petitioners' Exhibit 4. Respondent Gordon cited as his authority to do so, W.S. §§ 19-13-102 and 104 and W.S. § 35-4-115(a)(i).  Furthermore, Respondent Gordon publicly stated that such temporary action was necessary to "flatten the curve" of the affect of Covid-19. Respondent Gordon further acknowledged that the citizens of Wyoming did just that.[15]

12. Thereafter, the State and county health officers began issuing their own health orders at various times and of varying degrees. While most of these orders have been rescinded, State and county health officers have allowed and assisted school districts and school administrative personnel to issue their own Covid-19 policies.

13. Each and every one of these various EOs, health orders and policies were, and continue to be issued arbitrarily without lawful authority which resulted in confusing and chaotic outcomes such as the closing of businesses, limited government service, limited business services, the closing of schools and day care facilities, and the mandatory wearing of face coverings that serve no medical purpose as to the declared emergency as a few examples. These various arbitrary decisions have resulted in many and repeated

---

[15] April 17, 2020 press release https://content.govdelivery.com/accounts/WYGOV/bulletins/287209c

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

violations of the Petitioners' rights and liberties.

14. The Petitioners believe, and therefore contend that all the decisions, orders and policies issued after March 13, 2020, and the outcomes thereof, are a direct result of Respondent Gordon's arbitrary decision on March 13, 2020 to issue an EO declaring a Statewide State of Emergency without any creditable factual basis or lawful authority to do so.

14. W.S. § 35-4-115(a)(i) states:

"Public health emergency" means an occurrence or imminent threat of an illness or health condition caused by an epidemic or pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

15. The Petitioners believe, and therefore contend, that W.S. § 35-4-115(a)(i) sets forth certain criteria that MUST be met to invoke the authority of emergency powers. The Petitioners further contend that not a single one of the criteria set forth in W.S. § 35-4-115(a)(i) existed within Wyoming on March 13, 2020; nor has ever existed to present.

16. First and foremost, decisions must be made pursuant to the statutory criteria based on actual creditable factual data/documentation as to what the condition/situation is in Wyoming – **NOT** on outlandish computer models; or what the WHO does or says; or what a U.S. President does or says; or what other States are doing. It must be based upon creditable documentable facts as to what the condition/situation is in Wyoming.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

17. In his March 13th, 2020 EO, Respondent Gordon stated in the second "Whereas", that the WHO "declared the outbreak of COVID-19 a public health emergency of international concern;". Based upon this WHO declaration, Respondent Gordon states how other actors "declared a public health emergency". Thus, as Respondent Gordon makes clear, every declaration was based upon the WHO declaration. But what was not stated was that the declaration by the WHO was based upon a new definition it arbitrarily made up of what constituted a pandemic. See Petitioners' Exhibits 5, 6, 7, attached hereto and incorporated herein as though set forth in full. But this new arbitrarily made up definition IS NOT the meaning and intent of the framers of Wyoming Stat § 35-4-115(a)(i). The words "epidemic" and "pandemic" within the statute were based upon the definition and understanding of the day. An understanding that is expressed in the statute itself: "that poses a substantial risk of a **significant number** _of human fatalities_ or incidents of permanent or long-term disability." (emphasis added)  As such, it is this bases to which W.S. § 35-4-115(a)(i) must be read, interpreted, and applied.

18. Furthermore, Respondent Gordon stated that such was temporarily necessary to "flatten the curve". And most Wyoming citizens were willing to give Respondent Gordon the benefit of the doubt. But such quickly changed as Respondent Gordon and health officials blindly followed federal actors constantly moving the goal post. The

media further assisted and participated in these arbitrary changes by a campaign of getting use to a "new normal" - meaning a permanent change to our entire structure of society. To this point, Petitioners assert that the purpose of W.S. § 35-4-115(a)(i) is intended to be a *temporary* measure to address a real creditable health threat; not a means to make permanent changes to the foundation structure of society.

19. Second, even if it is assumed for the sake of argument that Covid-19 was a "novel" virus in 2019, Petitioners assert that it's novelty has a shelf life. Assuming, for the sake of argument, that the Covid-19 virus was first known in November of 2019 (as seems to be the generally accepted time frame and publicly stated by many), two years has now passed. During that time, thousands of scientific, medical personnel, researchers and experts have studied the virus. As such, Petitioners thus assert that it can no longer hold the status of being "novel". There must be an end point to the emergency justification.

20. Third, the next criteria that can be used to invoke the authority of W.S. § 35-4-115(a)(i) is a ***novel*** <u>and</u> highly fatal infectious agent or a biological toxin ***that poses a substantial risk of a significant number of human fatalities*** or incidents of permanent or long-term disability. As to the virus being "novel", Petitioners assert that corona viruses have been around for a very long time – more than 50 years; as well as the knowledge and means to medically treat them. The so-called virus being referred to as Covid-

19/SARP-CoV-2 is nothing more than a mutation of a KNOWN virus. All viruses mutate. Flu viruses mutate. Cold viruses mutate. The very designation/classification – SARP-CoV-2 – shows that it is not a new virus – but rather a mutation of a known virus.

21. Finally, it has been demonstrated that a range of pre-existing memory CD4$^+$ T cells that are cross-reactive with comparable affinity to SARP-CoV-2 and the common cold coronaviruses HCoV-OC43, HCoV-229E, HCoV-NL63, or HcoV-HKU1.[16]

22. Furthermore, in addition to being novel, such infectious agent or a biological toxin MUST ALSO ***pose a substantial risk <u>of a significant number of human fatalities</u>*** or incidents of permanent or long-term disability. Using the Respondents' very own alleged case numbers of fatalities[17], at no time has the virus ever posed ***a substantial risk <u>of a significant number of human fatalities</u>*** or incidents of permanent or long-term disability to Wyoming citizens generally.[18]

23. Furthermore, to maintain the illusion that there is a severe health issue throughout Wyoming, the Respondents have and continue to put forth alleged numbers of cases and deaths without any meaningful context. According the Census Bureau,

_____

16 Longitudinal analysis shows durable and broad immune memory after SARP-CoV-2 infection with persisting antibody responses and memory B and T cells https://pubmed.ncbi.nlm.nih.gov/33948610/
17  969 as of October 1, 2021
18 Facilities such as those in nursing homes and hospitals may be an exception to this. In fact, it seems that at least 90 percent of fatalities have been within such facilities; especially with patients that are 65 or older and/or had other per-existing conditions. Moreover, there is not any creditable documentation that even one of these 969 fatalities was caused by Covid-19. See footnote 6 supra.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Wyoming has an estimated population of 578,000. As of October 1, 2021, the Wyoming

Health Department alleges that there has been 996 deaths over the last 18 months. But

none of the Respondents, nor the main stream media, make the point that population

matters when making public service announcement or within news articles. Yet, even the

State health department admits that population must be considered.[19]  When making

public service announcements, none of the Respondents have ever compared the alleged

number of cases or deaths to the population such as: "There has been 969[20] deaths out of

our population of 578,000; which equates to .17% of our population." In fact, the

population of Wyoming, or with a county, is never set forth on the State health web page,

even though it admits that such critical information "is important".  While each death is

tragic, .17% does not represent a sufficient number out of over 80,000 alleged cases. That

places the death rate at about 1.2%; far lower than the 6% pure Covid-19 deaths reported

by the CDC in August 2020.[21,22] None of the Respondents have ever put the alleged case

and death numbers into meaningful context. On the contrary, the Wyoming Department

_____

19 Wyoming COVID-19 Map and Statistics Dashboard Interpretation; 7/22/2020 "Population sizes vary
greatly between counties, when you are comparing your county to another it is important *to use rates
instead of counts*. A rate is a measure of the number of events *per population*, during a given time
period."
20  As shown on October 1, 2021.
21 COVID-19 Data Collection, Comorbidity & Federal Law: A Historical Retrospective
https://www.researchgate.net/publication/344753727_COVID-
19_Data_Collection_Comorbidity_Federal_Law_A_Historical_Retrospective
22 Johns Hopkins Study Explodes COVID Death Hoax; It's Re-Labeling on a Grand Scale
"This patient who died had an ordinary heart attack." "Not anymore. We're repackaging it as COVID."
https://blog.nomorefakenews.com/2020/11/30/johns-hopkins-study-explodes-covid-death-hoax/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

of Health runs and maintains public service announcements to scare citizens into believing that a virus that has only affected a very small percentage of Wyoming citizens and a death rate that is all but nil, is worse than the black death.

24. To further maintain the illusion of a severe health crisis, the Respondents use and rely upon the results of a ***clinical*** tool known as the Real-Time RT-PCR Diagnostic Panel which is better known as and referred to as the RT-PCR test (hereinafter PCR). The Petitioners assert that such use and reliance upon the PCR as a diagnostic test is outside the standards of medical practice and procedures. Petitioners further assert that there are fatal flaws in using the PCR as a diagnostic tool such as:

1) The PCR IS NOT, and was never intended to be used as a diagnostic tool as evidenced by the designer of the test.[23],[24]  See Petitioners' Exhibit 8.

2) Issues with the RT-PCR Coronavirus Test seems to be designed to produce as many positive tests as possible.[25],[26] See Petitioners' Exhibits 9 and 10.

---

23 PCR Tests with Dr. Tom Cowan & Kary Mullis  https://www.bitchute.com/video/EN78RCYKA7Yr/
24 PCR Test Revelations From Official Literature; They Expose Their Own Lies
https://blog.nomorefakenews.com/2021/02/23/pcr-test-revelations-from-official-literature-they-expose-their-own-lies/
25 CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel
https://www.fda.gov/media/134922/download
26 Correlation Between 3790 Quantitative Polymerase Chain Reaction–Positives Samples and Positive Cell Cultures, Including 1941 Severe Acute Respiratory Syndrome Coronavirus 2 Isolates
https://academic.oup.com/cid/article/72/11/e921/5912603

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

3) The PCR does not actually test for the Covid-19 virus.[27,28,29,30,31,32,33,34,35]

4) The PCR is not a true diagnostic test as it is easily manipulatable. As such, the Respondents can determine at will the number of alleged cases or death of Covid-19 by simply having the testing facilities change the number of cycles of the PCR. Simply put, the Respondents can cause the number of alleged case or deaths to rise or fall at will. For example, if the Respondents want to have evidence that a mask mandate is working, they can, individually or together, have testing facilities lower the cycles at which the PCR is run. Conversely, if the Respondents wants to have evidence that more or continued restrictions are needed, they can, individually or together, have testing facilities increase the cycles at which the PCR is run.

25. One of the critical pieces of information necessary for citizens to be fully

informed of is the number of cycles each PCR test is run. Yet, none of the Respondents,

---

27 Manufactured Pandemic: Testing People for Any Strain of a Coronavirus, Not Specifically for COVID-19 https://www.globalresearch.ca/manufactured-pandemic-testing-people-any-strain-coronavirus-not-specifically-covid-19/5707781

28 WHO (finally) admits PCR tests create false positives Warnings concerning high CT value of tests are months too late...so why are they appearing now? The potential explanation is shockingly cynical. https://off-guardian.org/2020/12/18/who-finally-admits-pcr-tests-create-false-positives/

29 COVID19 PCR Tests are Scientifically Meaningless Though the whole world relies on RT-PCR to "diagnose" Sars-Cov-2 infection, the science is clear: they are not fit for purpose  https://off-guardian.org/2020/06/27/covid19-pcr-tests-are-scientifically-meaningless/?fbclid=IwAR3G6Fuq8C-8XW7szL43scbKOYFx78irq52A6ZQCRdZmPMWiHTqD_2jv4Zo

30 COVID-19: Creating the Illusion of a Pandemic Through Diagnostic Tests https://blog.nomorefakenews.com/2020/04/08/corona-creating-illusion-of-pandemic-through-diagnostic-test/

31 Your Coronavirus PCR Test is Positive – You Still Might Not Have Covid-19; Exposing Unwelcome Truths About the Deep Flaws of PCR Testing  https://www.lewrockwell.com/2021/01/gary-g-kohls/your-coronavirus-pcr-test-is-positive-you-still-might-not-have-covid-19/

32 FDA Admits PCR Tests Give False Results, Prepares Ground For Biden To "Crush" Casedemic https://www.zerohedge.com/covid-19/fda-admits-pcr-tests-give-false-results-prepares-ground-biden-virus-rescue-miracle

33 Fauci States COVID Test Has Fatal Flaw; Confession From the "Beloved" Expert of Experts https://blog.nomorefakenews.com/2020/11/06/smoking-gun-fauci-states-covid-test-has-fatal-flaw/

34 COVID Tests Gone Wild—An Epidemic of COVID Positive Tests https://internationalman.com/articles/covid-tests-gone-wild-an-epidemic-of-covid-positive-tests/

35 Issues with the RT-PCR Coronavirus Test https://theinfectiousmyth.com/coronavirus/RT-PCR_Test_Issues.php

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

nor any of the testing facilities, have ever released this critical information. The Petitioners assert that they – and all citizens of Wyoming – have a right to know this critical information. The Petitioners further assert that the Respondents, individually and together, have a duty to fully inform the Petitioners and all citizens of Wyoming regarding ALL necessary aspects regarding the declared emergency including, but not limited to, the bases of the testing procedure. Whether the withholding of this information is intentional or through negligence, the result is that it violates the Petitioners', and all Wyoming citizens' right to be fully informed. See footnote 1 supra.

26. Furthermore, based upon what is known about the PCR, and how other States have determined the cycles at which the PCR processed, the Petitioners assert that the alleged case and death numbers are at least, and more than likely, 35-50 percent lower than what the Respondents are presenting publicly.

27. Based upon Respondent Gordon's arbitrarily issued EO of March 13th, 2020, county health officers throughout Wyoming began issuing arbitrary health orders of their own, mandating such things as the closing of certain businesses, how close citizens could get to each other, and the mandatory wearing of face coverings; none of which served any medical purpose as to the declared emergency. Moreover, the Laramie county health website (as does the CDC website) makes it plain that it is ***unhealthy*** for healthy

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

individuals to wear face coverings as shown by Petitioners' Exhibit 11.[36] As such,

Petitioners contend that each and every health order that mandates the wearing of a face

covering is not only arbitrary, but contrary to the majority of creditable scientific and

medical documentation regarding face coverings See Petitioners' Exhibits 12, 13, and 14

attached hereto and incorporated herein as though set forth in full.[37,38,39,40,41,42,43,44]

    28. Thus, the Petitioners contend that the purpose of the various orders and public

service announcements is to scare citizens into accepting the Respondents' solutions

without having to fully inform the public of the lack of severity of the true nature of the

Covid-19 virus.

------------------------

36 Twenty Reasons Mandatory Face Masks are Unsafe, Ineffective and Immoral
https://www.globalresearch.ca/twenty-reasons-mandatory-face-masks-are-unsafe-ineffective-and-immoral/5735171
Masks are Harmful: 17 Ways That Masks Can Cause Harm
https://ratical.org/PandemicParallaxView/MasksAreHarmful-Meehan2020.html
37 'Masks Are Symbolic,' say Dr Fauci and The New England Journal of Medicine
https://hennessysview.com/masks-are-symbolic-dr-fauci/
38 Dear Humans: Face Masks Don't Work - The study-review was published by your very own CDC
https://blog.nomorefakenews.com/2020/07/20/face-masks-dont-work-study-published-by-your-very-own-cdc/
39 Nonpharmaceutical Measures for Pandemic Influenza in NonhealthcareSettings—Personal Protective
and Environmental Measures. https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article
40 Association of State-Issued Mask Mandates and Allowing On-Premises Restaurant Dining with
County-Level COVID-19 Case and Death Growth Rates — United States, March 1–December 31, 2020
https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7010e3-H.pdf
41 Anthony Fauci Dismissed Masks in 2019 as a 'Paranoid' Tool
https://www.breitbart.com/politics/2021/09/16/anthony-fauci-dismissed-masks-2019-paranoid-tool/
42 What Does the Science Say About Masks - Time to Defund the Forced Maskers
https://www.lewrockwell.com/2020/12/joseph-mercola/time-to-defund-the-forced-maskers/
43 Graphs show mask mandates don't stop COVID  https://www.wnd.com/2020/10/4865713/
44 Unmasking the Facts  https://www.markmallett.com/blog/unmasking-the-facts/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

29. Furthermore, it has been publicly asserted by dozens of medical personnel over the last 18 months, that asymptomatic individuals do not spread the Covid-19 virus. A study of almost ten million people confirm this.[45],[46],[47],[48]

30. Petitioners assert that they and every citizen has a right to be fully informed as to all aspects and information regarding and relating to any declared emergency, including the fact that asymptomatic individual do not spread the Covid-19 virus. Yet again, this important information is not stated by any of the Respondent; nor is it stated anywhere on the State health or any county health web page. Petitioners assert that each and every Respondent has a duty and responsibility to fully inform the citizens as to all aspects and information regarding and relating to any declared emergency. Petitioners assert that this is especially true when it comes to citizens making health care decisions during a public health emergency. By withholding critical and information, the Respondents, together and separately, have failed in their duty and responsibility in their official governmental capacity. The result of Respondents decisions to withhold critical medical and scientific information, whether intentional or through negligence, has lead citizens to make health

45 COVID-19 Study of Almost Ten Million Finds No Evidence of Asymptomatic Spread, Media Quiet https://theconservativetreehouse.com/2020/12/20/covid-19-study-of-almost-ten-million-finds-no-evidence-of-asymptomatic-spread-media-quiet/
46 Post-lockdown SARP-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China https://www.nature.com/articles/s41467-020-19802-w
47 Asymptomatic People Do Not Spread COVID-19 https://www.lewrockwell.com/2020/12/joseph-mercola/asymptomatic-people-do-not-spread-covid-19/
48 WHO now says spread of COVID-19 from asymptomatic individuals "very rare" https://disrn.com/news/who-now-says-spread-of-covid-19-from-asymptomatic-individuals-very-rare

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

care decisions based upon misleading and/or false information and assumptions; or to independently seek accurate information so that they can make informed medical decisions for themselves and the children.

31. On May 26, 2021, multiple experts authored a Washington Post opinion article entitled "It's time for children to finally get back to normal life", wherein they assert that the risk to children is too low to justify the remaining restrictions they face, and that "schools should lift mask requirements for children, especially outdoors".[49]

32. The authors of this article are unreservedly qualified to make this science-supported assertion. Tracy Beth Hoeg is a physician, an epidemiologist and an associate researcher at the University of California at Davis. Lucy McBride is a practicing internist in Washington. D.C. Allison Krug is an epidemiologist in Virginia Beach. Monica Gandhi, an infectious-disease physician, is a professor of medicine at the University of California at San Francisco.

33. As noted in the article: "On average, fewer than 0.01 percent of Americans are currently infected, and the chance of an asymptomatic person transmitting to a close contact is about 0.7 percent. That yields a scant 0.00007 percent chance that any close contact will transmit infection to a child. If the contact is outdoors, the risk appears to be more than 1,000 times lower. (Id.)

---

[49]  https://www.washingtonpost.com/opinions/2021/05/26/its-time-children-finally-get-back-normal-life/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

34. On September 2, 2021, Vinay Prasad M.D., MPH, practicing hematologist-oncologist and Associate Professor in the Department of Epidemiology and Biostatistics at the University of California San Francisco, authored an article in The Atlantic, wherein he stated that the educational cost of face coverings is far better established than the benefits of face mask mandates for children. Dr. Prasad noted that "No scientific consensus exists about the wisdom of mandatory-masking rules for schoolchildren."[50]

35. Yet, even with the forgoing medical and scientific knowledge from unreservedly qualified individuals widely available, shortly after the Fall 2021 school year began, many school districts began instituting face covering policies that required all staff, attendees and visitors to wear face coverings. Petitioners, together and separately, allege that such policies were made without any lawful authority to do so; and contrary to creditable medical and scientific documentation and recommendations by qualified experts.

36. Respondents' face-masking mandate policies for school-aged children is especially egregious in light of the fact that the side-effects of mask wearing are well documented. In research published by the International Journal of Environmental Research and Public Health, the researchers were able to demonstrate that both healthy and sick people can experience Mask-Induced Exhaustion Syndrome (MIES), with

---

50 https://www.theatlantic.com/ideas/archive/2021/09/school-mask-mandates-downside/619952/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

typical changes and symptoms that are often observed in combination, such as an

increase in breathing dead space volume, increase in breathing resistance, increase in

blood carbon dioxide, decrease in blood oxygen saturation, increase in heart rate, increase

in blood pressure, decrease in cardiopulmonary capacity, increase in respiratory rate,

shortness of breath and difficulty breathing, headaches, dizziness, feeling hot and

clammy, decreased ability to concentrate, decreased ability to think, drowsiness, decrease

in empathy perception, impaired skin barrier function with itching, acne, skin lesions and

irritation overall perceived fatigue and exhaustion.[51,52]

37. While the side-effects of facemask wearing are well documented, there are no

rational benefits from requiring children in school to wear face-coverings since these

children associate and play together without face covering during off school hours.

38. Furthermore, in a randomized control study conducted in Denmark,

researchers found that face masks offer no significant protective effect for their wearer

and the public.[53]

39. Dr. Baker states that the Denmark study, "[l]ikely represents a near best-case

51 New Danish Study Finds Masks Don't Protect Wearers From COVID Infection A newly released
study in the academic journal Annals of Internal Medicine casts more doubt on policies that force healthy
individuals to wear face coverings. https://fee.org/articles/new-danish-study-finds-masks-don-t-protect-
wearers-from-covid-infection/
52 Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and
Free of Potential Hazards?  https://www.mdpi.com/1660-4601/18/8/4344
53 Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARP-
CoV-2 Infection in Danish Mask Wearers  https://www.acpjournals.org/doi/10.7326/M20-6817#

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

scenario in terms of high-quality mask use, likely far outstripping mandated masking among K.-12 schoolchildren in public schools using masks of highly variable quality and condition." Id. According to the Denmark study, even high quality surgical masks offer no significant protection.

40. Moreover, the claims that the particle size of a COVID- 19 virus is approximately 0.1 micron, which is significantly smaller than the particle diameters (8-30 microns) of surgical and fabric masks, then there is no scientific basis to claims that face-coverings prevent the spread of COVID- 19.

41. Moreover, face mask policies imposed by Respondents are unnecessary for the protection of children's public health and welfare because COVID- 19 is not a danger for children any more than many every day activities and illnesses.

42. Further, while exemptions to the face covering policies are allowed, Respondent school districts maintain a policy so arbitrarily restrictive that most of the parentally authorized exemptions are ignored or outright denied even though Respondent school districts have no authority to make medical decisions; nor any authority to violate the rights of the Petitioners to make medical decisions for their children as is set forth and secured by Article 1 § 38 of the Wyoming Constitution.

43. Respondent school district further issued policies that mandated the quarantining of children and staff for simply being in the vicinity of another individual

that allegedly had the Covid-19 virus; even if the individual was asymptomatic.

44. To add insult to injury, Respondent Gordon has lowered himself to childish behavior of name calling, referring to individuals and groups who have ventured to get informed as "knuckleheads" in an effort to discredit those who are exercising their rights and publicly putting forth factual information supported by scientific and medical documentation. The purpose of which, the Petitioners allege, is to maintain the illusion that there is such a serious health threat to Wyoming citizens that communist totalitarian tactics must be used and the very fabric of society must be permanently changed.

45. Petitioners believe, and therefore contend that neither the Governor, nor any health official, nor any school district board or personnel, nor any school administration, staff or employees can make arbitrary or capricious decisions either outside the statutes, nor decisions that are not based upon known creditable best evidence scientific and medical documentation. Petitioners further contend that when evaluating health emergency authority, public health decisions must be evaluated and justified under a common legal and ethical standard, including: (1) individuals must pose a significant risk of spreading a dangerous, infectious disease; (2) interventions must be likely to ameliorate risks; (3) actions taken must be narrowly drawn to achieve the stated objective; (4) the action taken must be specific to accomplish a specified outcome; (5) the Respondents must use the least-restrictive means necessary to achieve the stated

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

objectives; (6) use of coercion should be proportionate to the risk; and (7)

decision/actions must be based on the best available scientific/medical evidence.

Petitioners assert that health emergencies do not warrant coercion that is indiscriminate,

excessive, or without evidentiary support. Arbitrary decisions and actions have no

authority; they are as unconstitutional as a statute that is in violation of constitutional

limitations, protection and standards.

46.   In the present instance, this is particularly true regarding W.S. § 35-4-115(a)(i)

and Article 1 § 38 of the Wyoming Constitution for two reason. First, the statue must

conform to the Constitution from a general point of view.[54] And second, Article 1 § 38 is

---

[54] In Wisconsin Legislature v. Andrea Palm, Justice Rebecca Bradley stated *the order of the law* quite succinctly:

"¶66 Under the Wisconsin Constitution, all governmental power derives "from the consent of the governed" and government officials may act only within the confines of the authority the people give them. Const. art. I, § 1. Wis. The people of Wisconsin never consented to any elected official, much less an unelected cabinet secretary, having the power to create law, execute it, and enforce it. "[E]ver vigilant in averting the accumulation of power by one body— —a grave threat to liberty——the people devised a diffusion of governmental powers" among three branches of government. (cite omitted) Whenever any branch of government exceeds the boundaries of authority conferred by the people, it is the duty of the judicial branch to say so.

"¶67 However well-intentioned, the secretary-designee of the Department of Health Services exceeded her powers by ordering the people of Wisconsin to follow her commands or face imprisonment for noncompliance. (footnote omitted) In issuing her order, she arrogated unto herself the power to make the law and the power to execute it, excluding the people from the lawmaking process altogether. **The separation of powers embodied in our constitution does not permit this**. Statutory law **being subordinate to the constitution**,3 **not even the people's representatives in the legislature may consolidate such power in one person**. (emphasis added)

To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961)"

Justice Bradley doesn't stop there. She continues:

     "**The Constitution's supremacy over legislation bears repeating**: 'the Constitution is to be considered in court **as a paramount law' and 'a law repugnant to the Constitution is void**, and . . .

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

the most recent. Simply put, Article 1 § 38 is the last order given. As such, it is incumbent that all decisions and actions taken by each and every Respondent, even during a health crisis, must not be in violation of Article 1 § 38.

## PARTIES

### Plaintiffs

47. Shelta Rambur, is a citizen of Wyoming and resides Sheridan. She has two daughters (ER-13 and AR-15) who attend school in Sheridan county school district #2 (hereinafter SCSD#2).

48. The school board issued a district wide policy that all individuals when in school facilities or buses shall wear a face covering (hereinafter a mask).

49. Shortly thereafter, her daughters started complaining of headaches. Her youngest daughter (ER), suffers from anxiety and takes prescribed medication. Knowing and understanding her daughters needs and difficulties, plaintiff Rambur has repeatedly tried to exercise her right as a parent to make medical decisions for her daughters notifying school and district personnel, from Superintendent Scott Stults, to the school

---

courts, as well as other departments, are bound by that instrument.' See Marbury [v. Madison], 5 U.S. (1 Cranch) [137] at 178, 180 [1803]."
  The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable." Justice Bradley, Wisconsin Legislature v. Andrea Palm, No. 2020AP765-0A.rgb, May 13, 2020, pgs 40-41.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

board, to school administrators and teachers. Working together and separately, the plaintiff's rights have been infringed on and even outright prevented despite the clear language of Article 1 § 38 of the Wyoming Constitution and W.S. § 14-2-206.

50. Moreover, not only have school administrators and teachers, together and separately, allowed harassment, bullying and abuse of her daughters in violation of W.S. § 6-2-503, but have actually engaged in such unlawful action contrary to W.S. § 14-3-201 et.seq. See affidavit of Shelta Rambur attached hereto as Exhibit 15 and incorporated herein as though set forth in full.

51. SCSD#2 personnel and employees further violated the rights of plaintiff Rambur and her daughters by ignoring the provisions of § 564 of the Federal, Food, Drug, and Cosmetic Act.[55] See Petitioners' Exhibit 16 attached hereto and incorporated herein as though set forth in full. Specifically, neither Petitioner Rambur nor either of her daughters were ever informed or notified of the potential consequential negative adverse affects of using the experimental medical device which SCSD#2 personnel and employees and administration personnel contended was "required" by the SCSD#2 policy; nor informed of their right to decline to participate as required by section 564.

52. When Petitioner Rambur tried to attend school board meetings to demand that SCSD#2 personnel and employees comply with and follow the pertinent and appropriate

_____

55 Codified as 21 U.S.C.§ 360bbb-3.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

State and federal constitutional provisions and statutes, her first amendment rights to attend school board meetings pursuant to Wyoming's open meeting statutes laws (W.S. § 16-4-403), and as secured by the the first amendment to the federal constitutional and Article 1 § 20 of the Wyoming  Constitution, were infringed upon and at times out-right ignored and denied.

53. Petitioner Rambur further contends and alleges that the many and repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon Declaration of Emergency based upon the faulty and unsound application and use of  W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained and continue by the out-right unlawful actions of the rest of the Respondents working together and separately and by the dishonest, deceitful and fraudulent use of the PCR test.

54. As such, Petitioner Rambur further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrary decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner

Rambur and her children's rights.

55. Petitioner Rambur asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

56. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner Rambur **directly challenges as unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health *emergency* exists or has ended."

57. Under the ***guise*** of a public health *emergency*, Respondent Gordon has made it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ."[56] (emphasis added)

The "programs" referred to are all funding programs. In the words of Respondent Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost reimbursement*** <u>***are based upon the existence of a public health***</u>

---

[56] Cowboy State Daily. April 15, 2021, https://cowboystatedaily.com/2021/04/15/wyomings-state-of-emergency-needed-for-federal-funds/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

**emergency**," . . . "So there would be *financial consequences* to the state were the governor to lift the state of emergency."[57] (emphasis added)

58. This ***non***-health excuse was set forth in response to Fremont County Commissioners attempt to end the emergency declaration based upon and citing "steady declines in coronavirus cases seen in the past several months."

59. Petitioner Rambur contends and asserts that the purpose of W.S. § 35-4-115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any funding issue** that may or may not actually exist. This is especially true when the alleged funding issues were the result of the unlawful activities of the Respondents upon their own and working in conjunction with various actors at the federal level. Petitioner Rambur asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

60. Petitioner Rambur asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon, the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they**

---

[57] Id.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

**want** despite the fact that NO **extraordinary** health emergency condition exist in the

State of Wyoming.

61. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in

original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event. (emphasis added)  https://www.dictionary.com/browse/emergency

The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens ***suddenly*** or ***unexpectedly*** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

62. Petitioner Rambur asserts that Wyoming § 35-4-115(a)(i) – when read properly

- states:

"Public health emergency" means an [***unexpectedly***] occurrence or [***unexpectedly***] imminent threat of an illness or health condition caused by an [***unexpectedly***] epidemic or [***unexpectedly***] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

63. Petitioner Rambur asserts that a normal reading of "The governor shall declare

when a public health "***emergency"*** exists or has ended." would be understood that a

limitation is built into such a statement; in this case, a true scientific factually creditable

medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

ends *automatically* when the "crisis/emergency" no longer exist. When no true scientific factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-115(a)(i) can no longer exist.

64. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson do not see this and believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and working together and with federal actors, constantly and repeatedly moved the goal posts. And to support their repeated and constant moving of the goal post, they have relied upon:

1. The deceitful use of meaningless PCR testing.

2. Absurd and meaningless numbers presented to the public without any meaningful context.

3. A  bogus and deceitful accounting process that is intended to mislead the public.[58]

4. A bogus and deceitful marketing[59] campaign *designed* to scare the public into believing that Covid-19 is as bad or worse than the black plague.

5. Withholding vital information from the public such as the number of cycles that the PCR is being run at.

65. As such, Petitioner Rambur challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

_____

58 See  Footnote 5 supra.

59 The War on Medical Freedom  https://www.naturalnewsblogs.com/the-war-on-medical-freedom/

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

66. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.[60]

67. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announced to the public until the end of December doesn't mean it was "novel".

68. Petitioners, together and individually, assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And they assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

69. Petitioner Tiffany Leimback is a citizen of Wyoming and resides in Sheridan. She is a single mom of two boys P age 12 and P age 9; P&P hereinafter who suffer from compromised lungs from having RSV and croup when they were little. See affidavit of Petitioner Leimbeck attached as Exhibit 17, and incorporated herein as though set forth in full. P&P used to attend Woodland Park Elementary School in SCSD#2. They are now homeschooling because of the actions taken by SCSD#2 school board and its faculty

---

60 Why did the Rothschilds patent COVID-19 biometric tests in 2015 and 2017?
https://stateofthenation.co/?p=33959

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

members.

70. During the 2020/21 School year, Petitioner Leimback, attempted multiple times to have her kids be mask free, before the actual start of school. Attempting to comply with the face covering policy, P&P wore masks at school and both children began having adverse side effects both mental and physical health difficulties.

71. Then, Petitioner Leimback exercised her right as a parent and pursued medical and religious exemptions for her sons, in accordance with the State Health orders, notifying them that she was exempting her boys from the mask policy. Without any lawful authority to make medical decisions, petitioner Leimback was summarily informed that exemption or both her boys were denied even though P&Ps physical and physiological health conditions continued to decline.

72. All exemptions were denied with no legal or constitutional basis. Leimback, along with other parents was also a part of a petition to exempt her children from masks. It was presented to SCSD#2 and fell on deaf years.

73. During the latter part of the school year, Petitioner Leimback received a call from Mrs. Vold around 4:30 Friday afternoon, without any lawful authority to make medical decisions informing Leimback that younger P had been exposed to a positive case on Monday, 4 days prior and was now being quarantined for 14 days. However, since P had already been in school for 4 days they would take that off the at home

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

quarantine. Leimback argued that P, now under quarantine, had showed NO symptoms of covid-19 and the incubation period of 3-5days given to here by Vold, would be over and P would return to school on Monday. This was denied, Petitioner Leimback never received anything from a public health official or the public health office. She was told by Vold that documentation from Public Health would be forthcoming, that the school was only making these calls as a request by public health in order to help them out.

74. During the 2020-2021 school year, the mistreatment of P&P by teachers and staff increased to unprecedented levels.  Many conversations were ignored and Leimback was even denied meetings. Multiple attempts made by Petitioner Leimback to get her children out of masks, failed.

75. Petitioner Leimback' children were being harassed by staff at school, disciplined for breathing outside of their masks and losing recess time. After an incident, on recess, principal Alison Vold told Petitioner Leimback, "If your child needs a breathing break, he needs to ask for permission." This is child abuse, requiring her children to ask to breathe.

76. After repeated failed attempts and a very long conversation with the Vold, it was understood by both parties that if P&P's "perceived" disobedient mask behavior improved inside the school they would be able to social distance outside without being in trouble. After discussions with her children, it was decided they would fly under the radar

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

and finish the school year. However, 2 weeks later, she received frantic text messages from the eldest P. He was again getting in trouble for social distancing. Leimback arrived at the school and confronted the teachers at the front desk. During this conversation, Vold and 2 other teachers began to harass, bully and mentally abuse eldest P in the foyer of his school in violation of W.S. § 6-2-503, and W.S. § 14-3-201 et.seq. Mrs. Vold even referred to P's attempts to breath as "disobedient" "disrespectful" "rude" and informed that such activity would result in "disciplinary action." or suspension.  Furthermore, in addition to their own violation of W.S. § 6-2-503, and W.S. § 14-3-201 et.seq., Vold also disregarded bullying and harassment of P&P by other children. The  harassment, bullying, and abuse eventually turned into discrimination as set forth in Petitioner Leimback's affidavit.

77. Petitioner Leimback began educating herself on the politics of Covid-19. She started attending, or more correctly, attempting to attend school board meetings, just to find out that not only her right to make medical decisions for her boys mean nothing to SCSD#2 trustees and personnel, school administrators and staff, but that Wyoming's open meeting laws (W.S. § 16-4-403) meant nothing to them either; nor her first amendment rights as secured by the U.S. Constitution and Article 1 § 20 of the Wyoming Constitution).

78. After much research and study, Petitioner Leimback came to the same

conclusions as Petitioner Rambur and thus contends and alleges that the many and repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained and continue by the out-right unlawful actions of the rest of the Respondents working together and separately and by the fallacious, deceitful and fraudulent use of the PCR test.

79. As such, Petitioner Leimback further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner Leimback and her sons' rights.

80. Petitioner Leimback asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

81. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner Leimback **directly challenges as unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health *emergency* exists or has ended."

82. Under the ***guise*** of a public health *emergency*, Respondent Gordon has made it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ." (emphasis added; See FN 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost reimbursement*** <u>**are based upon the existence of a public health emergency**</u>," . . . "So there would be *financial consequences* to the state were the governor to lift the state of emergency." (emphasis added) (emphasis added; See FN 60 supra)

83. This ***non***-health excuse was set forth in response to Fremont County Commissioners attempt to end the emergency declaration based upon and citing "steady declines in coronavirus cases seen in the past several months."

84. Petitioner Leimback contends and asserts that the purpose of W.S. § 35-4-115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any**

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

**funding issue** that may or may not actually exist. This is especially true when the alleged funding issues were the result of the unlawful activities of the Respondents upon their own and working in conjunction with various actors at the federal level. Petitioner Leimback asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

85. Petitioner Leimback asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

86. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

(emphasis added)  https://www.dictionary.com/browse/emergency

The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens *suddenly* or *unexpectedly* and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

87. Petitioner Leimback asserts that Wyoming § 35-4-115(a)(i) – when read properly -  states:

"Public health emergency" means an [*unexpectedly*] occurrence or [*unexpectedly*] imminent threat of an illness or health condition caused by an [*unexpectedly*] epidemic or [*unexpectedly*] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

88. Petitioner Leimback asserts that a normal reading of "The governor shall declare when a public health "*emergency"* exists or has ended." would be understood that a limitation is built into such a statement; in this case, a true scientific factually creditable medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority ends *automatically* when the "crisis/emergency" no longer exist. When no true scientific factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-115(a)(i) can no longer exist.

89. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson do not see this and

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and working together and with federal actors, constantly and repeatedly moved the goal posts. And to support their repeated and constant moving of the goal post, they have relied upon:

1. The deceitful use of meaningless PCR testing.

2. Absurd and meaningless numbers presented to the public without any meaningful context.

3. A  bogus and deceitful accounting process that is intended to mislead the public.[61]

4. A bogus and deceitful marketing[62] campaign ***designed*** to scare the public into believing that Covid-19 is as bad or worse than the black plague.

5. Withholding vital information from the public such as the number of cycles that the PCR is being run.

90. As such, Petitioner Leimback challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

91. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.[63]

92. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel

---

61  See Footnote 5 supra
62  See Footnote 62 supra
63  See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017.[64] In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announced to the public until the end of December doesn't mean it was "novel".

93. Petitioners, together and individually, assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And they assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

94. Petitioner Jessica McComb is a citizen of Wyoming and resides in Laramie. She is mother of two boys; DR (age 5) and 17-year-old AR. AR attended Laramie High school which is in Albany County School District#1 (hereinafter ACSD#1). Both children have documented disabilities and medical conditions and were approved for a mask waiver as a result of their qualifying disabilities in late Spring 2021. However, the long-standing mask policy, shut downs, fear driven campaigns and extreme tensions surrounding COVID have caused measurable physical, emotional, social, developmental and cognitive harm to the children. Even though AR had a waiver, the environment at school became so hostile that he stopped going to school as set forth in her affidavit, attached hereto as Exhibit 18, and incorporated herein as though set forth in full.

---

64  See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

95. School personnel have engaged in discriminatory and divisive actions in their communication via public Facebook posts and turned the school into a hostile and abusive environment as set forth more fully in Petitioner McComb's affidavit.

96. After AR was approved for a mask waiver by the public health officer, Petitioner McComb received an email from Jeff Stender, the assistant principle, on March 30, 2021 asking that he still wear a mask at specified times during the school day. Repeatedly, school personnel did not want to honor the waiver. AR has told his mother that teachers still harassed him in the halls and threaten him with disciplinary actions. AR reports that some of his teachers also shamed him for not wearing a mask.

97. The school psychologist, Jacqueline Grimes participated in the shaming and discrimination through acts of "liking" Emily Siegal's post relating those unvaccinated as "menaces" and "drunk drivers". Jacqueline Grimes was working with me and AR to get him on an IEP to help him get the supports he needs to complete school. AR has not gotten the supports and care he needs as a result of biased and discriminatory actions of school personnel because my children have mask waivers as a result of qualifying disabilities.

98. Petitioner McComb fears for her children safety and educational needs in this environment wherein school personnel are themselves engaging in such harassment and bullying in violation of W.S. § 14-3-201 et.seq. and W.S. § 6-2-503.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

99. Due to the unlawful and very negative treatment of her children, they express feelings of being unwelcomed and unwanted in the current school environment; which has directly attributed to significant attendance issues for AR, a decline in his physical and mental health and a lack of interest of school personnel helping AR.

100. On Friday, September 10, there was an organized nationwide student walk out to protest masks and their negative effects on student learning and wellbeing.  As students prepared to exercise their right to free speech and assemble peacefully, students were threatened by coaches, teachers and students. They were threatened that they would not be able to play in their respective sport, in homecoming and threatened with suspension in the national walk out protest. Teachers stood by exits on this date and discouraged students from participating. A video on Facebook shows a group of students throwing items out of their car at fellow students on the sidewalk protesting the mask mandate. Other text messages show students sharing in bullying of those who do not wear masks telling them "making urself look real fuckin dumb rn lmafao" and showing their middle fingers. Other students held up a sign stating "I want your sick relatives to die." The environment was and still is toxic and discouraging of anyone who wants to speak out about the abuses inside schools.

101. A group of female students on the volleyball team wanted to participate in the protest but were threatened by coaches so they walked out and stood away from the

crowd protesting in fear of being retaliated against. Petitioner McComb was a first-hand witness to this and sat with this group of students as they discussed the threats they received.  This is direct evidence that the impractical and completely useless mask policy has created a hostile and abusive environment.

102. Mr. Lee, AR's school counselor, set up a time to meet with AR via email to discuss getting him on an IEP at this September 10 student walk-out date. This was not a coincidence. It sends the message that if you want to attend school and be supported, you must obey and not question or exercise your rights. Despite numerous pleas to get AR assistance and evaluated for an IEP,  Mr. Lee has ignored him. Last year Petitioner McComb sent in evaluation requests from AR's doctor to be completed and returned by Mr. Lee. These were never filled out and returned despite numerous reminders and inquiries by Petitioner McComb. Petitioner McComb's concerns about AR's wellbeing and the toxic environment have been shared with teachers, the superintendent, the special education director, and the school board. Nothing has been done to address Petitioner McComb's concerns of discrimination and the toxic, hostile environment even after emailing the Title IX coordinator, Scott James.

103. Petitioner McComb's children have experienced trauma and her oldest has completely shut down and stopped going to school all together. The school system has completely failed petitioner McComb's children and ignored her request to have her

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

oldest evaluated for an IEP. There has been a constant barrage and focus on domination, force and power when it comes to masks, social distancing and shaming and the needs of individuals with a disability are being completely ignored. The hyper-focus and extreme measures taken have caused disproportion harm to petitioner McComb's children. The mask mandates have created the opposite of a safe, healthy and thriving learning environment. Despite AR having a mask waiver, he has continuously been threatened in the halls to be taken to the principles and been singled out and shamed for not wearing a mask. It has become an exhausting battle that he no longer wants to fight so he has stopped attending school and his mental health has declined.

104. DR, Petitioner McComb's five-year-old son has an IEP and a variety of social, emotional and developmental needs. Despite requesting a reasonable accommodation from his teachers to wear clear mask, this has been ignored. His main teacher, Ms. Purcell has refused to make this accommodation and as a result, DR has been negatively impacted. DR struggles with emotion and behavior regulation, fine motor, sensory processing and communication skills. Additionally, DR has a medical diagnosis of encopresis. Under normal circumstances, he struggles to learn and manage stressful life events. The mask mandate has caused further delays, stress and relapses in his conditions. His teachers and everyone around him are masked, void of emotion and create isolating environments. He has responded with behavioral outbursts and is visibly

stressed. He reports not liking school when asked. On the contrary, he thrives at his daycare where masks are not mandatory and children can appropriately socialize and engage with each other without fear and shaming.

105. Based upon the forgoing, Petitioner McComb  thus contends and alleges that the many and repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of  W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained and continue by the out-right unlawful actions of the rest of the Respondents working together and separately and by the fallacious, deceitful and fraudulent use of the PCR test.

106. Petitioner McComb further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrary decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner McComb's and her children's rights.

107. Petitioner McComb asserts and alleges that in addition to other rights

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

108. Petitioner McComb **directly challenges as unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health *emergency* exists or has ended."

109. Under the ***guise*** of a public health *emergenc*y, Respondent Gordon has made it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ." (emphasis added; See FN 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost reimbursement*** <u>**are based upon the existence of a public health emergency**</u>," . . . "So there would be *financial consequences* to the state were the governor to lift the state of emergency." (emphasis added) (emphasis added; See FN 60 supra)

110. This ***non***-health excuse was set forth in response to Fremont County Commissioners attempt to end the emergency declaration based upon and citing "steady declines in coronavirus cases seen in the past several months."

111. Petitioner McComb contends and asserts that the purpose of W.S. § 35-4-115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any funding issue** that may or may not actually exist. This is especially true when the alleged funding issues were the result of the unlawful activities of the Respondents upon their own and working in conjunction with various actors at the federal level. Petitioner McComb asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

112. Petitioner McComb asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

113. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event.
(emphasis added)  https://www.dictionary.com/browse/emergency

The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens ***suddenly*** or
***unexpectedly*** and needs fast action in order to avoid harmful results. (emphasis
added) https://dictionary.cambridge.org/us/dictionary/english/emergency

114. Petitioner McComb asserts that Wyoming § 35-4-115(a)(i) – when read

properly -  states:

"Public health emergency" means an [***unexpectedly***] occurrence or
[***unexpectedly***] imminent threat of an illness or health condition caused
by an [***unexpectedly***] epidemic or [***unexpectedly***] pandemic disease, a
novel and highly fatal infectious agent or a biological toxin that poses a
substantial risk of a significant number of human fatalities or incidents
of permanent or long-term disability. The governor shall declare when
a public health emergency exists or has ended."

115. Petitioner McComb asserts that a normal reading of "The governor shall

declare when a public health "***emergency"*** exists or has ended." would be understood that

a limitation is built into such a statement; in this case, a true scientific factually creditable

medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority

ends ***automatically*** when the "crisis/emergency" no longer exist. When no true scientific

factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-

115(a)(i) can no longer exist.

116. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

health officer Alexia Harrist, and interim director Stefan Johansson do not see this and believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and working together and with federal actors, constantly and repeatedly moved the goal posts. And to support their repeated and constant moving of the goal post, they have relied upon:

1. The deceitful use of meaningless PCR testing.

2. Absurd and meaningless numbers presented to the public without any meaningful context.

3. A  bogus and deceitful accounting process that is intended to mislead the public.[65]

4. A bogus and deceitful marketing[66] campaign *designed* to scare the public into believing that Covid-19 is as bad or worse than the black plague.

5. Withholding vital information from the public such as the number of cycles that the PCR is being.

117. As such, Petitioner McComb challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

118. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.[67]

119. Furthermore, even if it could be said that Covid-19 was novel at the time of

---

65  See Footnote 5 supra
66  See Footnote 62 supra.
67  See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017.[68] In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announced to the public until the end of December doesn't mean it was "novel".

120. Petitioners, together and individually, assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And they assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

121. Petitioner Bobbi Dockins is a citizen of Wyoming and resides in Torrington with her husband Russell. She and Russell are raising 3 grandchildren who attend school in Goshen County. The oldest is 17 and a senior at Torrington High School (THS hereinafter). The middle child is 15 and a sophomore at THS. The youngest is 14; an 8th grader that attends school at Southeast, in Yoder, WY. Both schools are in the Goshen County School District #1 (GCSD#1 hereinafter).

122. As set forth in her affidavit, attached hereto as Exhibit 19 and incorporated herein as though set forth in full, the oldest takes accutane which dries out his face and cracks his lips for which continuous mask wearing exacerbates. Not only did school staff

_____

68  See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

ignore his medical condition, when he tried to explain  why he wasn't wearing it, and he was asked to leave the school grounds. The school never notified the Petitioner or her husband as to the event; or to ask if there was a valid reason as to why he couldn't wear a mask.

123. The middle child is hearing impaired and on an Individualized Education Program (IEP). He wears a hearing aid and reads lips. Last year when the mask mandate was put into place, Petitioner Dockins emailed administrators and teachers regarding the issues that Petitioner Dockins foresaw. Petitioner Dockins was informed that she could ask for a medical exemption; but that her grandchild would be segregated and watch classes via zoom. Petitioner Dockins responded by informing them that such an arrangement would not work on the grounds that segregation is against the law.

124. The youngest, is in her first year at Southeast. She has sensory issues, central auditory processing disorder, dyslexia, and is on a very lengthy IEP. When the mask mandate came into place she began having horrible headaches.  Petitioner Dockins expressed her concerns to the principal after the first day of the mandate and went home rather than going to volleyball practice because of a massive headache. She expressed that she was dizzy and felt like she was being suffocated. Not only did school staff ignore her medical condition, and known/documented learning disabilities, but was told to tighten her mask so there were no gaping sides (the mask was cloth with folds and elastic

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

straps). She was further instructed that she had to tie knots in the straps so it fit "extremely tight". This resulted in a serious melt down. While Petitioner Dockins could attempt to exercise her authority as secured by Article 1 § 38 of the Wyoming Constitution and W.S. § 14-2-206, she believes, based upon how she has seen other parents and their children treated, that the school administration would retaliate which would affect her emotionally and violate her civil rights.

125. Petitioner Dockins contends and alleges that the school board has overstepped their authority. She asserts that policies, health or otherwise, do not override constitutional provisions or State law. She further asserts that, not only do masks not provide protection from the Covid-19 virus; but that even if it did, her grandchildren routinely associate maskless with many classmates when not in school. Thus, she asserts, makes the school mask policy meaningless from a practical standpoint. Therefore, Petitioner Dockins specifically and directly challenges the mask policy as both statutory unlawful and unConstitutional on the grounds that it does not ameliorate risks and does not accomplish the specified purpose. She further asserts that the coercion being used is not proportionate to the risk. Lastly asserts that the mask policy is not based upon sound medical/scientific documentation or the best available scientific evidence, but rather is quite arbitrary, overbroad, excessive, or without evidentiary support. Petitioner Dockins bases her assertion upon three well established medical points.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

1) masks offer little to no protection even if they are worn properly.

2) children are the least affected by Covid-19 virus; they are the least likely to spread the virus and the death rate is virtually nil. (see: COVID-19 Transmission and Children - The Child Is Not to Blame; Johns Hopkins Study Found Zero COVID Deaths among Kids without Other Illness)

3) Regardless of age, asymptomatic People Do Not Spread COVID-19 - By Joseph Mercola

126. Petitioner Dockins further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner Dockins' and her children's rights.

127. Petitioner  Dockins asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

128. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner Dockins **directly challenges as**

**unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of

W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health

*emergency* exists or has ended."

129. Under the ***guise*** of a public health *emergenc*y, Respondent Gordon has made
it public that:

> "The state of emergency declared for Wyoming last year because of the
> coronavirus pandemic <u>needs to continue</u> ***to allow the state to take***
> ***advantage of certain federal programs*** . . ." (emphasis added; See FN
> 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent

Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal
> Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost***
> ***reimbursement*** <u>**are based upon the existence of a public health**</u>
> <u>**emergency**</u>," . . . "So there would be *financial consequences* to the state
> were the governor to lift the state of emergency." (emphasis added)
> (emphasis added; See FN 60 supra)

130. This ***non***-health excuse was set forth in response to Fremont County

Commissioners attempt to end the emergency declaration based upon and citing "steady

declines in coronavirus cases seen in the past several months."

131. Petitioner Dockins contends and asserts that the purpose of W.S. § 35-4-

115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any**

**funding issue** that may or may not actually exists. This is especially true when the

alleged funding issues were the result of the unlawful activities of the Respondents upon

their own and working in conjunction with various actors at the federal level. Petitioner Dockin asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

132. Petitioner Dockins asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon, the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

133. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event. (emphasis added) https://www.dictionary.com/browse/emergency

The Cambridge dictionary defines emergency as:
something dangerous or serious, such as an accident, that happens ***suddenly*** or ***unexpectedly*** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

134. Petitioner Dockins asserts that Wyoming § 35-4-115(a)(i) – when read
properly - states:

> "Public health emergency" means an [*unexpectedly*] occurrence or
> [*unexpectedly*] imminent threat of an illness or health condition caused
> by an [*unexpectedly*] epidemic or [*unexpectedly*] pandemic disease, a
> novel and highly fatal infectious agent or a biological toxin that poses a
> substantial risk of a significant number of human fatalities or incidents
> of permanent or long-term disability. The governor shall declare when
> a public health emergency exists or has ended."

135. Petitioner Dockins asserts that a normal reading of "The governor shall
declare when a public health "*emergency*" exists or has ended." would be understood that
a limitation is built into such a statement; in this case, a true scientific factually creditable
medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority
ends *automatically* when the "crisis/emergency" no longer exist. When no true scientific
factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-
115(a)(i) can no longer exist.

136. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State
health officer Alexia Harrist, and interim director Stefan Johansson do not see this and
believe that they can continue and maintain a state of emergency,  literally,  **as long as
they choose** using any excuse such as "funding". The Respondents have, individually and
working together and with federal actors, constantly and repeatedly moved the goal posts.
And to support their repeated and constant moving of the goal post, they have relied

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

upon:

    1. The deceitful use of meaningless PCR testing.

    2. Absurd and meaningless numbers presented to the public without any meaningful context.

    3. A bogus and deceitful accounting process that is intended to mislead the public.[69]

    4. A bogus and deceitful marketing[70] campaign **designed** to scare the public into believing that Covid-19 is as bad or worse than the black plague.

    5. Withholding vital information from the public such as the number of cycles that the PCR is being run.

    137. Petitioner Dockins challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.[71]

    138. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announce to the public until the end of December doesn't mean it was "novel".

    139. Petitioners, together and individually, assert that regardless of which of the

---

69  See Footnote 5 supra
70  See Footnote 62 supra.
71  See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

many angles one looks at Covid-19, every "emergency" has an end point. And they assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

140. Petitioner Candi Kusler is a citizen of Wyoming residing in Cheyenne. She has two children, MK (15) and LK (17). Both attend East High School which is in Laramie county School District #1 (LCSD#1 hereinafter).

141. MK has functioning autism and asthma, and suffers from bouts of anxiety and depression. He has struggled with cognitive issues which has been exacerbated by wearing a mask. He struggles to breath, is often, lethargic, and fatigued, has frequent headaches and cloudy headedness. He is now seeing a counselor.

142. Since mask policy went into affect, LK struggles with severe anxiety attacks, depression, fatigue and headaches. Last Spring LK began passing out and her anxiety attacks became worse. She too is currently seeing a counselor.

143. Petitioner Kusler spoke with the school nurse at the beginning of 2020 school year to see if MK could have a plan in the classroom if he began to hyperventilate or struggle with breathing. Petitioner's request was outright denied. Shortly after this denial, Petitioner Kusler found a suicide note in MK's notebook; at which time MK was immediately put into counseling.

144. Petitioner Kusler spoke with the school nurse at EAST high school about her daughters passing out at school and having anxiety attacks which became worse in

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

the Spring of 2021. Petitioner Kusler was informed that LK wasn't the only one. She was further informed that the reason was because "kids who wear masks don't drink as much as the should and become dehydrated and overheat and pass out."

145. Petitioner Kusler directly asserts and alleges that LCSD#1's mask policy is meaningless in that it doesn't accomplish any medical purpose in and of itself; and because her children, like 95 percent of their school mates, freely and routinely associate maskless outside of school. Petitioner Kusler further asserts and alleges that medical/health decisions are reserved to the parents and a common law right of parents as both a practical matter, and as per Article 1 § 38 of the Wyoming Constitution and W.S. § 14-2-206. She further asserts that this is especially true of her children and others similarly situated as it is the parents that have been and have to deal with other documented and on-going medical conditions of their children.

146. Petitioner Kusler further contends and alleges that the many and repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of  W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained and continue by the out-right unlawful actions of the rest of the Respondents working together and separately and by the fallacious, deceitful and fraudulent use of the PCR test.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

147. Petitioner Kusler further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner Kusler and her children's rights.

148. Petitioner Kusler asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

149. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner Kusler **directly challenges as unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health *emergency* exists or has ended."

150. Under the *guise* of a public health *emergenc*y, Respondent Gordon has made

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ." (emphasis added; See FN 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost reimbursement*** <u>are based upon the existence of a public health emergency</u>," . . . "So there would be *financial consequences* to the state were the governor to lift the state of emergency." (emphasis added) (emphasis added; See FN 60 supra)

151. This ***non***-health excuse was set forth in response to Fremont County Commissioners attempt to end the emergency declaration based upon and citing "steady declines in coronavirus cases seen in the past several months."

152. Petitioner Kusler contends and asserts that the purpose of W.S. § 35-4-115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any funding issue** that may or may not actually exist. This is especially true when the alleged funding issues were the result of the unlawful activities of the Respondents upon their own and working in conjunction with various actors at the federal level. Petitioner Kusler asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

153. Petitioner Kusler asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon, the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

154. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event. (emphasis added) https://www.dictionary.com/browse/emergency

The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens ***suddenly*** or ***unexpectedly*** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

155. Petitioner Kusler asserts that Wyoming § 35-4-115(a)(i) – when read properly - states:

"Public health emergency" means an [***unexpectedly***] occurrence or

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

[*unexpectedly*] imminent threat of an illness or health condition caused by an [*unexpectedly*] epidemic or [*unexpectedly*] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

156. Petitioner Kusler asserts that a normal reading of "The governor shall declare when a public health "***emergency***" exists or has ended." would be understood that a limitation is built into such a statement; in this case, a true scientific factually creditable medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority ends ***automatically*** when the "crisis/emergency" no longer exist. When no true scientific factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-115(a)(i) can no longer exist.

157. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson do not see this and believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and working together and with federal actors, constantly and repeatedly moved the goal posts. And to support their repeated and constant moving of the goal post, they have relied upon:

1. The deceitful use of meaningless PCR testing.
2. Absurd and meaningless numbers presented to the public without any meaningful

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

context.

3. A bogus and deceitful accounting process that is intended to mislead the public.[72]

4. A bogus and deceitful marketing[73] campaign **_designed_** to scare the public into believing that Covid-19 is as bad or worse than the black plague.

5. Withholding vital information from the public such as the number of cycles that the PCR is being run at.

158. As such, Petitioner Kusler challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

159. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.[74]

160. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announce to the public until the end of December doesn't mean it was "novel".

161. Petitioner Kusler assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And they assert that any "emergency"

---

72  See Footnote 5 supra.
73  See Footnote 62 supra.
74  See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

that might have existed on March 13, 2020 has long since passed.

     162. Petitioner Carleigh Boucher is a citizen of Wyoming residing in Sheridan. She has two boys, 4yo GB and 6yo JB.  JB has regular therapy because he suffers mental health issues resulting from trauma when he started kindergarten as set forth in Petitioner Boucher's affidavit, attached hereto as Exhibit 20 and incorporated herein as though set forth in full.

     163. As set forth by Petitioner Boucher in her affidavit, masks – both wearing one and seeing them on other kids – became a trigger regarding JB's mental health issues. As a result Petitioner Boucher has tried to work with both school staff and SCSD#2 board members; but such efforts have thus far proven useless.

     164. During the SCSD#2 board meeting of August 30, 2021, the board voted against unmasking. After the vote, trustee Ann Perkins told us parents that "it's time to strip away the individualized and political mindset."

     165. Petitioner Boucher directly alleges and asserts that the mask policies and the actions of superintendent Stults and the SCSD#2 board members is unconstitutional on it face in that it is a blatant violation of Article 1 § 38 of the Wyoming Constitution and W.S. § 14-2-206. Petitioner Boucher further asserts and alleges that the actions of superintendent Stults and the SCSD#2 board members have directly caused and contributed to psychological, physical, and social abuse which is prohibited by SCSD #2

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

own handbooks: "Code of Respect"; the "Students' Rights and Responsibilities",

"Bullying and Harassment". Petitioner Boucher further contends that such acts are a

violation of W.S. § 14-3-201 et.seq. and subject to prosecution by virtue of W.S. § § 6-2-

503.

166. Petitioner Boucher further contends and alleges that there is no medical, or

scientific basis for the current state of emergency. Petitioner Boucher contends and

alleges that the many and repeated violations of constitutional provisions, federal and

State statutes are directly attributed to and commenced by Respondent Gordon's

Declaration of Emergency based upon the faulty and unsound application and use of

W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained

and continue by the out-right unlawful actions of the rest of the Respondents working

together and separately and by the fallacious, deceitful and fraudulent use of the PCR

test.

167. Petitioner Boucher further contends and alleges that the decision to declare a

state of emergency and the continuation of said emergency was not and has never been

based upon any creditable scientific or medical factual foundation. From the first

declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates

requiring testing, masking and quarantines of healthy citizens, and the six foot distancing

mandates, have all been arbitrarily decisions without legal or scientific foundation which

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

have directly and indirectly resulted in the many and repeated violations of Petitioner Boucher and her children's rights.

168. Petitioner Boucher asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

169. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner Boucher **directly challenges as unConstitutional,** as it is being applied and as blatantly overboard, the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health *emergency* exists or has ended."

170. Under the ***guise*** of a public health *emergency*, Respondent Gordon has made it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ." (emphasis added; See FN 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost***

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

***reimbursement* <u>are based upon the existence of a public health emergency</u>**," . . . "So there would be *financial consequences* to the state were the governor to lift the state of emergency." (emphasis added) (emphasis added; See FN 60 supra)

171. This ***non*-**health excuse was set forth in response to Fremont County Commissioners attempt to end the emergency declaration based upon and citing "steady declines in coronavirus cases seen in the past several months."

172. Petitioner Boucher contends and asserts that the purpose of W.S. § 35-4-115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any funding issue** that may or may not actually exist. This is especially true when the alleged funding issues were the result of the unlawful activities of the Respondents upon their own and working in conjunction with various actors at the federal level. Petitioner Boucher asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

173. Petitioner Boucher asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon,  the Wyoming Dept. of Health, State health officer

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

174. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event. (emphasis added)  https://www.dictionary.com/browse/emergency

The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens ***suddenly*** or ***unexpectedly*** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

175. Petitioner Boucher asserts that Wyoming § 35-4-115(a)(i) – when read properly -  states:

"Public health emergency" means an [***unexpectedly***] occurrence or [***unexpectedly***] imminent threat of an illness or health condition caused by an [***unexpectedly***] epidemic or [***unexpectedly***] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

176. Petitioner Boucher asserts that a normal reading of "The governor shall declare when a public health "***emergency"*** exists or has ended." would be understood that a limitation is built into such a statement; in this case, a true scientific factually creditable

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority

ends ***automatically*** when the "crisis/emergency" no longer exist. When no true scientific

factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-

115(a)(i) can no longer exist.

177. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State

health officer Alexia Harrist, and interim director Stefan Johansson do not see this and

believe that they can continue and maintain a state of emergency,  literally,  **as long as**

**they choose** using any excuse such as "funding". The Respondents have, individually and

working together and with federal actors, constantly and repeatedly moved the goal posts.

And to support their repeated and constant moving of the goal post, they have relied

upon:

    1. The deceitful use of meaningless PCR testing.

    2. Absurd and meaningless numbers presented to the public without any meaningful context.

    3. A  bogus and deceitful accounting process that is intended to mislead the public.[75]

    4. A bogus and deceitful marketing[76] campaign ***designed*** to scare the public into believing that Covid-19 is as bad or worse than the black plague.

    5. Withholding vital information from the public such as the number of cycles that the PCR is being run at.

178. Petitioner Boucher challenges the constitutionally of the last sentence of W.S.

§ 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

---

75  See Footnote 5 supra.
76  See Footnote 62 supra.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

179. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.[77]

180. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announce to the public until the end of December doesn't mean it was "novel".

181. Petitioners Boucher assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And they assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

182. Petitioner Tamara Weaver is a citizen of Wyoming residing in Mt. View. Petitioner Weaver daughter DW is a sophomore at Mt. View High School.  Upon starting her freshman year of high school a year ago, DW started having panic attacks, hyper ventilating and refusing to go to school. DW went from being a straight A student to failing drastically in every class. The cause was identified by a physician as panic attacks over the thought of wearing a mask; a policy that was instituted and continues from

_____

[77] See footnote 60.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Respondent Gordon's unnecessary declaration. After seeing and visiting with DW, Petitioner Weaver discussed the situation with her physician, Dr. Lauri Morgan.  Dr. Morgan subsequently wrote a note stating that DW should not wear a mask or other face covering. Within the week, and in total violation of all ethical standards and DW's HIPAA rights, Principal Limoge took it upon himself to go to Dr. Morgan's office and have DW's note altered. Principal Limoge then started segregating DW from the other students. DW wasn't allowed to be in the hallway between classes. He would hold her in a classroom until the hallway was empty and then send her to her next class which caused her to be marked as tardy. And when asked why, her teachers would reply, "well wear a mask."

183. DW and Petitioner Weaver began getting doxed by parents and school board members. The situation got so bad that Petitioner Weaver had to removed DW from the Lyman High school and transferred her to Mountain View. But again, even with a note exempting DW, the staff refused to allow her to attend unless she wore a mask.

184. After making several attempts to get in contact with Governor Gordon, Petitioner Weaver was finally able to do so. His response was very condescending. As Petitioner Weaver appealed to him for help, he showed no empathy for her situation.

185. Petitioner Weaver contends that Principal Limoge acted without any lawful authority and violated DW's HIPAA rights by even going to see or speak with Dr. Morgan.  Moreover,  Principal Limoge violated Petitioner Weaver's parental rights as is

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

secured by Article 1 § 38 of the Wyoming Constitution and W.S. § 14-2-206.

186. Petitioner Weaver further asserts and alleges that  Principal Limoge's unlawful acts and the unlawful acts of UCSD#6 trustees, administrators and staff of both Lyman and Mt. View High schools, were caused by and predicated upon the unlawful declaration of emergency by Respondent Gordon and the unlawful and unfounded policies of the Respondents Wyoming Dept. of Health, State health officer, Alexia Harrist MD, UCSD#6  school board trustees.

187. Understanding that what was being done was both unlawful and morally wrong, Petitioner Weaver started educating herself in an effort to find a solution to address DW's dreadful situation and treatment. Through that effort, Petitioner Weaver thus contends and alleges that the many and repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained and continue by the out-right unlawful actions of the rest of the Respondents working together and separately and by the fallacious, deceitful and fraudulent use of the PCR test.

188. As such, Petitioner Weaver further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has

never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon to decisions and actions regarding testing, quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without any creditable scientific or medical factual foundation which have directly and indirectly resulted in the many and repeated violations of DW's and Petitioner Weaver's rights.

189. Moreover and in addition to the unlawful activities of the Respondents working together and separately, Petitioner Weaver **directly challenges as unConstitutional** (as it is being applied and as blatantly overboard), the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health emergency exists or has ended."

190. Under the ***guise*** of a public health emergency, Respondent Gordon has made it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ." (emphasis added; See FN 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost***

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

*reimbursement* <u>are based upon the existence of a public health</u>
<u>emergency</u>," . . . "So there would be *financial consequences* to the state
were the governor to lift the state of emergency." (emphasis added)
(emphasis added; See FN 60 supra)

191. This non-health excuse was set forth in response to Fremont County
Commissioners attempt to end the emergency declaration based upon and citing "steady
declines in coronavirus cases seen in the past several months."

192. Petitioner Weaver contends and asserts that the purpose of W.S. § 35-4-
115(a)(i) is to address a real and meaningful "Public health emergency"; NOT any
funding issue that may or may not actually exist. This is especially true when the alleged
funding issues were the result of the unlawful activities of the Respondents upon their
own and working in conjunction with various actors at the federal level. Petitioner
Weaver asserts that W.S. § 35-4-115(a)(i) is designed and intended as an extraordinary
tool to be use sparingly  during a time of GREAT EXTRAORDINARY health crisis.
Petitioner Weaver further asserts that the legislative intent is of a temporary nature. From
the beginning it was made clear that the EO declaration was temporary for the purpose of
"flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days"
was repeatedly mentioned.[78]  But the "flattening the curve" excuse and the temporary "2
weeks" time frame has morphed into a funding measure which, according the
Respondents Gordon, the Wyoming Dept. of Health, State health officer Alexia Harrist,

---

[78]  See footnote 15 supra.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO health emergency condition exist in the State of Wyoming.

193. Petitioner Weaver asserts that a normal reading of "The governor shall declare when a public health emergency exists or has ended." would be understood that a limitation is built into such a statement; in this case, a true and factually creditable health emergency; an EXTRAORDINARY health crisis. But that such authority ends *automatically* when the "crisis/emergency" no longer exist. When no true and factually creditable health emergency exist, the authority granted by W.S. § 35-4-115(a)(i) no longer exist.

194. It is clear that  Respondents Gordon, the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson do not see this and believe that they can continue and maintain a state of emergency literally as long as they choose using any excuse such as "funding". As such, Petitioner Weaver challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as being applied and as blatantly overbroad.

195.  Petitioner Grace Smith is a citizen of Wyoming living in Laramie where she was a sophomore at Laramie High School which is in Albany county school district #1 (ACSD#1 herein after).

196. ACSD#1 instituted a face covering policy shortly after the school year began.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

On September 9th, the day that the school started, the school staff began handing out exemption request forms. They made some students leave the building. After about 20 minutes they gave up on making kids leave. Petitioner G. Smith stood in front of the school from the time she got kicked out through the lunch period with two signs that read "no more masks" and "join our peaceful protest". About 5 other students filtered in and out of the protests. Some students began screaming at the protesters and screaming such things as "You're murderers!" and "You think you have the right to do this?" The protesters got called vulgar names and Petitioner G. Smith was hit in the head with a baseball. Around 2:00pm Petitioner G. Smith spoke with the assistant principle, Mr. Humphrey about getting hit.

197. That evening Petitioner G. Smith began to organize a more organized protest build around a nation wide walk-out protest movement. About 10:00am on the 10th, Petitioner G. Smith was joined by approximately 80 student and 30 parents and supporters. The protest continued until about 2:30pm.

198. As the situation progressed over the next several days, Petitioner G. Smith began getting openly abused by other students. At about 3:00pm on September 15th Petitioner G. Smith met with the ACSC#1 superintendent, Dr. Yennie, in his office. Petitioner's father, Andy G. Smith, her grandfather, Steve G. Smith, and Uncle, Luke G. Smith, all attended. They asked questions about who had the authority to establish and

enforce a mandate. Superintendent Yennie talked in circles and the only answer that the Petitioner got from him was relating to arresting kids. When asked if he would have kids arrested for not complying to the mandate he said, "If it comes to that, yes."

199. On September 22nd Petitioner on her way to her 8th hour study hall class at 1:30. Petitioner's study hall teacher was Diane Chamberlain. At this time, there were at least 5 other students fully not wearing a mask. Chamberlain called the Petitioner to the front of the classroom about 10 minutes into the class period and hurried over to her desk to grab a mask. Waiving the mask in the air so the whole room could see, Chamberlain handed the mask to the Petitioner and said in a direct tone: "put this on". Petitioner said nothing and just held it in her hand because she believed that Chamberlain had something to show the Petitioner on the computer. After about 30 seconds, Chamberlain grabbed the mask back out of Petitioner's hand, and without saying anything, Chamberlain reach for Petitioner's face in an attempt to forceably put the mask on Petitioner's face. At that point Petitioner too the mask away from Chamberlain and said "No thank you". Chamberlain immediately got flustered and said in a stressed tone: "Then get out of my class". Petitioner replied: "Seriously?" Chamberlain responded: "Yes or I'll call the authorities". Within a few minutes, three other students were kicked out of the class. After about 15 minutes, Ms. Chamberlain came out and told us that we made her feel unsafe and in order to respect her job and her pay check, she needed to enforce the rules of the people in

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

charge of her.

200. Petitioner G. Smith, along with other students, continued to protest and exercise her rights as the weeks went by. Then, on September 30th, Petitioner G. Smith was notified by superintendent Yennie that she was being suspended from school for exercising her rights.  Petitioner G. Smith informed superintendent Yennie that she would not proceed or communicate any further until her father was present.  Petitioner's father arrived soon after being notified of the situation along with  Petitioner's uncle. A meeting was held with the following present: Petitioner, G. Smith, her father, Andy G. Smith, her uncle Luke, Mr. Lewis and superintendent Yennie. Petitioner, and her father informed them of Article 1 § 38 of the Wyoming Constitution. Superintendent Yennie's responded by stating that if Petitioner stayed, she would be trespassing due to the suspension and that the school would be put on lockdown,  Superintendent Yennie totally ignored the constitutional challenge of Article 1 § 38. Petitioner G. Smith contends and asserts that Superintendent Yennie, as well as every trustee, employee, administrators, and staff of ACSD#1 **are** as much bound by the constitution and laws of Wyoming as Petitioner G. Smith. Their very words and actions scream their sentiment: We can ignore any law we choose if and when Petitioner G. Smith and/or her father exercise their constitutionally protected rights. Superintendent Yennie et.al. intentionally and blatantly went out of their

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

—

way in an attempt to covert the exercise of rights into a punishable criminal action.[79]

Petitioner G. Smith contends and alleges that the very act of doing so, not only violated her and her father's rights, but is in fact, a criminal act itself. Petitioner G. Smith contends and alleges that Superintendent Yennie et.al. acted unlawfully to create a situation to force Petitioner G. Smith into submission to their arbitrary will; or face criminal charges. Petitioner G. Smith was given two choices: submit; or incriminate herself with her actions.[80]

---

[79] "The claim and exercise of a constitutional right cannot thus be converted into a crime" Miller v. US (5th Circuit) 230 F. 2d. 486 (1956)

"We find it intolerable that one constitutional right should have to be surrendered in order to assert another." Simmons v. United States, 390 U.S. 377, 394 (1968); "[t]here are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." Garrity v. New Jersey, 385 U.S. 493, 500 (1967); See also: Gardner v. Broderick, 392 U.S. 273, 277-78 (1968);  Lefkowitz v. Cunningham, 431 U.S. 801, 808 (1977).

"…it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachment thereon." Byars v. United States 273 US 28 (1927)

"…an ordinance which makes the peaceful enjoyment of freedoms which the constitution guarantees conting**ent upon the uncontrolled will of an official** – as by requiring a permit or license **which may be granted or withheld in the discretion of such official** – **is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms**."Staub v. Baxley 355 US 313 (1958) (emphasis added)

"If a law has 'no other purpose…' **than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional**." United States v. Jackson 390 US 570 (1968) (emphasis added)

[80] "The privilege against self-incrimination is neither accorded to the passive resistant, nor to the person who is ignorant of his rights, nor to one indifferent thereto. **It is a FIGHTING clause**. **It's benefits can be retained only by sustained COMBAT**. It cannot be claimed by attorney or solicitor. **It is valid only when insisted upon by a BELLIGERENT claimant in person**." McAlister vs. Henkel, 201 U.S. 90, 26 S.Ct. 385, 50 L.Ed. 671; Commonwealth vs. Shaw, 4 Cush. 594, 50 Am.Dec. 813; Orum vs. State, 38 Ohio App. 171, 175 N.E. 876. The one who is persuaded **by honeyed words or moral suasion\*** to testify or produce documents rather than make a last ditch stand, simply loses the protection. . . . He must refuse to answer or produce, and test the matter in contempt proceedings, or by habeas corpus."  States v. Johnson, 76 F. Supp. 538, 539 (D. Pa. 1947), Federal District Court Judge James Alger Fee (emphasis added)

\*suasion: the act of advising, urging, or attempting to persuade; persuasion.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

201. Petitioner G. Smith returned to school on October 5th, at which time she was instructed to go to the office around 10:00am. After being informed of a second suspension, Petitioner G. Smith refused to leave the school voluntarily.[81]  At that time, Officer Bellman issued the Petitioner a $500 trespassing citation. The Petitioner was then locked in the office.

202. On October 7th, after her second suspension ended, Petitioner returned to school. While walking down the hallway around 8:20am, she was stopped by an administrator, Jeremy Qualls, who told Petitioner that she could not return to class. Petitioner started walking towards the doors to the main classroom areas.[82] As Petitioner G. Smith approached the doorway, athletic director Ron Wagner locked the doors. He stood there and guarded the door. Petitioner tried to push her way past Wagner who then slammed the door shut in Petitioner's face; stating: "I can't let you in without a mask". Mr. Qualls then brought out paperwork for a third suspension around 8:35am. When Petitioner G. Smith told Officers Bellman and Johnson that she would not be leaving,[83] they immediately issued another $500 citation. Petitioner refused to voluntary leave and the school responded by issuing an unwarranted total lockdown.

203. At about 8:50am Petitioner's cousin, Christian G. Smith, left class to come and sit with her on the stairs in the lunchroom. Around 9:00am, Terri Jo Gillum, and

81  Id.
82  Id.
83  Id.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Sandy Reese (two moms of other students) stood in front of the school to video Petitioner's arrest. Petitioner was then taken to jail wherein she was processed and released with no bond or bail.

204. On October 13th, Petitioner withdrew from Laramie High School so that she could continue with her education.

205. While Petitioner G. Smith would like to be able to continue and finish her education with her friends, but the totalitarian dictatorship mentality of ACSD#1 Superintendent Yennie et.al. has made such impossible thus violating Article 1 § 38. Thus, Petitioner contends and alleges that not only have her rights been violated, but that she was specifically targeted along with a few other student because they choose to exercise their rights.  Furthermore,  Petitioner, along with a few other students, have been bullied and abused by both staff and students in complete violation of  W.S. § 6-2-503, and contrary to W.S. § 14-3-201 et.seq.

206. Further,  Petitioner G. Smith knows and understands that face coverings serve no medical or governmental purpose. Petitioner G. Smith, like the majority of others, freely associate without face coverings outside of school. Thus, the face covering policy makes no sense and serves no purpose.

207. Therefore, Petitioner G. Smith contends and alleges that the face covering policy is unconstitutional on its face for the follow reason:

1) The school district board, administrators, employees or staff has no authority to make medical decisions; especially ones that are contrary to constitutional provisions such as the clear language of Article 1 § 38 of the Wyoming Constitution.

2) The school district board, administrators, employees or staff has no authority to make decisions contrary to W.S. § 14-3-201 et.seq.

3) The school district board, administrators, employees or staff has no authority to make policies or decisions contrary to § 564 of the Federal, Food, Drug, and Cosmetic Act.[84]

208. From the outset of the declared emergency, Respondent Gordon made it clear such policies were "temporarily" necessary "to flatten the curve." Petition G. Smith alleges that that time frame has long passed; especially since:

1) There has not been a single Covid-19 fatality at any of the schools within ACSD#1.

2) Asymptomatic individuals do not spread the virus.

3) Those under twenty (20) years of age are least likely to get Covid; and the most likely to recover.

4) Face coverings serve no meaningful medical purpose and do not serve any governmental interest.

5) The ACSD#1 face covering policy is without lawful authority to make medical decisions and is in violates both statutory law and constitutionally protected rights.

209. As a result of the situation as set forth, Petition G. Smith sought legal counsel, which in turn has resulted in Petition G. Smith learning that there is a whole lot of unlawful activity directed relate to Covid. Thus, base on all that Petitioner has experienced and learned, Petitioner G. Smith contends and alleges that the many and

---

84  See FN 59.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of W.S. § 35-4-115(a)(i).

210. Petitioner G. Smith further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner G. Smith's rights.

211. Petitioner G. Smith asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

212. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner G. Smith **directly challenges as unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of

W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health

*emergency* exists or has ended."

213. Under the ***guise*** of a public health *emergency*, Respondent Gordon has made

it public that:

> "The state of emergency declared for Wyoming last year because of the
> coronavirus pandemic <u>needs to continue</u> ***to allow the state to take***
> ***advantage of certain federal programs*** . . ." (emphasis added; See FN
> 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent

Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal
> Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost***
> ***reimbursement*** <u>***are based upon the existence of a public health***</u>
> <u>***emergency***</u>," . . .   "So there would be *financial consequences* to the state
> were the governor to lift the state of emergency." (emphasis added)
> (emphasis added; See FN 60 supra)

214. This ***non***-health excuse was set forth in response to Fremont County

Commissioners attempt to end the emergency declaration based upon and citing "steady

declines in coronavirus cases seen in the past several months."

215. Petitioner G. Smith contends and asserts that the purpose of W.S. § 35-4-

115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any**

**funding issue** that may or may not actually exist. This is especially true when the alleged

funding issues were the result of the unlawful activities of the Respondents upon their

own and working in conjunction with various actors at the federal level. Petitioner

Leimback asserts that W.S. § 35-4-115(a)(i) is designed and intended as an

**extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary

health crisis.

216. Petitioner G. Smith asserts that the legislative intent is of ***a temporary nature***.

From the beginning it was made clear that the March 13, 2020 EO declaration was for the

temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2

weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and

the temporary "2 weeks" time frame has morphed into a funding measure which,

according the Respondents Gordon,  the Wyoming Dept. of Health, State health officer

Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they**

**want** despite the fact that NO **extraordinary** health emergency condition exist in the

State of Wyoming.

217. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in

original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate
action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event.
(emphasis added)  https://www.dictionary.com/browse/emergency

218. The Cambridge dictionary defines emergency as:

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

something dangerous or serious, such as an accident, that happens **suddenly** or **unexpectedly** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

219. Petitioner G. Smith asserts that Wyoming § 35-4-115(a)(i) – when read properly -  states:

> "Public health emergency" means an [**unexpectedly**] occurrence or [**unexpectedly**] imminent threat of an illness or health condition caused by an [**unexpectedly**] epidemic or [**unexpectedly**] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

220. Petitioner G. Smith asserts that a normal reading of "The governor shall declare when a public health "**emergency"** exists or has ended." would be understood that a limitation is built into such a statement; in this case, a true scientific factually creditable medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority ends **automatically** when the "crisis/emergency" no longer exist. When no true scientific factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-115(a)(i) can no longer exist.

221. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson do not see this and believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

working together and with federal actors, constantly and repeatedly moved the goal posts.

222. As such, Petitioner G. Smith challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

223. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.

224. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announce to the public until the end of December doesn't mean it was "novel".

225. Petitioner G. Smith joins the other Petitioners and assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And she assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

226. Petitioner Andy Smith is a citizen of Wyoming living in Laramie with his wife and their three children. He is the father of Petitioner Grace Smith. As responsible parents, he and his wife have made effort to raise their children in a manner so that they

will be responsible adults and good citizens.

227. At the beginning of the 2021 school year, their daughter Grace went to her parents and expressed to them that she did not want to wear a mask. Petitioner A. Smith told Grace that he had no problem with such; but that he would look into the legality of the policy and whether there was any authority to make the face covering policy; and if so, Grace would have to comply or withdraw from the school.

228. What Petitioner A. Smith learned, and therefore believes, is that such policy is in direct violation of the Wyoming constitution. Believing this, Petitioner A. Smith and his brother Luke began placing phone calls on or about September, 10th 2021 to the Governor's office, State Health Department, State School Board, County Health Department, Albany County Superintendent and the Chairman of the Albany County School Board. Petitioner A. Smith and Luke called each department and asked for someone to provide the legal statute/authority for the Universal Mask Policy being enforced in ACSD#1. What Petitioner A. Smith found out from the Governor's office on down, was that no one was able to provide the evidence to support that ACSD#1 had any authority for their face covering policy. At each encounter Petitioner A. Smith informed them of Article 1, Sec. 38 of the Wyoming Constitution. In response, each in turn deferred to the next entity until the only entity left was the ACSD#1 Board.

229. That is when Petitioner A. Smith decided to meet with the Superintendent,

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Yennie. On September 15, 2021 Petitioner A. Smith met with Yennie and asked him to provide the evidence that gave them the authority to make and enforce the face covering mandate. Superintendent Yennie was unable to provide any evidence, but stated that he believed that the board did have the authority to make and enforce their own policy - even to the point of arresting students.[85] Petitioner Smith then reached out the Chairman of the Board, Mrs. Marshall and asked her the same question. Mrs. Marshall responded with an email saying they were waiting for a memo from the State Attorney General's Office that would say they could make and enforce their own face covering policy. Mrs. Marshall also stated that they had the support of Governor Gordon.

230. To this day, Petitioner Smith has never received the alleged documentation to which Mrs. Marshall; nor any documentation from any individual whom Petitioner or his brother Luke had talked to.

231. When the 2021 school year began, and the face covering policy was set forth by ACSD#1, Mr. Smith exercised his parental rights as a father to allow his daughter Grace to determine for herself as to whether she followed the masking policy or not. Mr. Smith trusted his daughter Grace to make the right decision and granted her the authority to do so.

---

[85]"…an ordinance which makes the peaceful enjoyment of freedoms which the constitution guarantees contingent upon the uncontrolled will of an official – as by requiring a permit or license which may be granted or withheld in the discretion of such official – is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."Staub v. Baxley 355 US 313 (1958)

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

232. Petitioner Smith contends and alleges that the attempt by Superintendent Yennie, the Trustees, employees, administrators and staff of ACSD#1 to make their face covering policy "mandatory" is an usurpation of his parental rights and is thus unlawful and unconstitutional. Furthermore, Petitioner Smith contends and alleges that this is especially egregious because of all the effort he and his brother Luke had made to get and understand the legal authority to make, and then enforce, the face covering policy.

233. Once disciplinary action began to take place on September 30th, (1st Suspension) every person Mr. Smith met with, was informed that their actions were in direct violation of the Wyoming Constitution and an infringement on his and his daughter's rights.

234. Totally ignoring and in spite of the fact that each and every individual was put on notice of the rights violation, the High School personnel proceeded to enforce their disciplinary actions of three 2 day suspensions and two $500 trespassing citations against Grace and her subsequent arrest on October 5, 2021.

235. Leading up to Grace's arrest Mr. Smith met with: Principal Lewis, Superintendent  Yennie, two School Resource Officers and their boss Lt. Smith. These law enforcement officers assured Mr. Smith that they would not arrest Grace. On the day of the arrest, Mr. Smith spoke with Assistant Principal Humphrey and informed him he was in violation of Grace's rights. Mr. Smith also called Lt. Smith and reminded him that

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

he said they would not arrest his daughter. After the arrest Mr. Smith met with Laramie Police Chief Stalder. Two days later Mr. Smith met with the Albany County Sheriff. Mr. Smith asked each of them to step in on Grace's behalf per the constitution and each stated: "that's a civil matter and would have to be taken to court." For the Smiths, this was the most frustrating aspect regarding Grace's situation; that no one would step in to protect and defend her constitutional rights; even with the clear language of Article 1 § 38 of the Wyoming Constitution.

236. In addition to receiving no assistance from law enforcement to enforce Article 1 § 38(a) of the Wyoming Constitution, Mr. Smith contends and alleges that his daughter was directly and intentionally targeted and bullied; that Grace was used to be made an "example of". Sense Grace's suspensions and arrest, no other kids at Laramie High School have been suspended and many kids are still not wearing masks.

237. Mr. Smith contends and alleges that there is no authority whatsoever to make, much less enforce any "mandatory face covering policy by ACSD#1; or anyone else for that matter. Mr. Smith further contends that the face covering policy serves no medical purpose or governmental interest. Petitioner A. Smith contends and alleges that there is not a single shred of documentation that shows that face covering normally warn by the students, teachers, and staff has prevented a single case of stopping the spreading of the Covid-19 virus.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

238. After speaking with counsel and looking at actual documentation, Mr. Smith contends and alleges that the many and repeated violations of constitutional provisions, and federal and State statutes, are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of W.S. § 35-4-115(a)(i).

239. Petitioner A. Smith further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner A. Smith's rights.

240. Petitioner A. Smith asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

241. Moreover and in addition to the unlawful activities of the Respondents,

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

working together and separately, Petitioner A. Smith **directly challenges as**

**unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of

W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health

*emergency* exists or has ended."

    242. Under the ***guise*** of a public health *emergency*, Respondent Gordon has made

it public that:

> "The state of emergency declared for Wyoming last year because of the
> coronavirus pandemic <u>needs to continue</u> ***to allow the state to take***
> ***advantage of certain federal programs*** . . ." (emphasis added; See FN
> 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent

Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal
> Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost***
> ***reimbursement*** <u>**are based upon the existence of a public health**</u>
> <u>**emergency**</u>," . . . "So there would be *financial consequences* to the state
> were the governor to lift the state of emergency." (emphasis added)
> (emphasis added; See FN 60 supra)

243. This ***non***-health excuse was set forth in response to Fremont County

Commissioners attempt to end the emergency declaration based upon and citing "steady

declines in coronavirus cases seen in the past several months."

244. Petitioner A. Smith contends and asserts that the purpose of W.S. § 35-4-

115(a)(i) is to address a real and meaningful "Public health emergency"; **NOT any**

**funding issue** that may or may not actually exist. This is especially true when the alleged funding issues were the result of the unlawful activities of the Respondents upon their own and working in conjunction with various actors at the federal level. Petitioner Leimback asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

245. Petitioner A. Smith asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon, the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

246. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

(emphasis added)  https://www.dictionary.com/browse/emergency

247. The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens **suddenly** or **unexpectedly** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

248. Petitioner A. Smith asserts that Wyoming § 35-4-115(a)(i) – when read

properly -  states:

> "Public health emergency" means an [**unexpectedly**] occurrence or [**unexpectedly**] imminent threat of an illness or health condition caused by an [**unexpectedly**] epidemic or [**unexpectedly**] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

249. Petitioner A. Smith asserts that a normal reading of "The governor shall

declare when a public health "**emergency**" exists or has ended." would be understood that

a limitation is built into such a statement; in this case, a true scientific factually creditable

medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority

ends **automatically** when the "crisis/emergency" no longer exist. When no true scientific

factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-

115(a)(i) can no longer exist.

250. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State

health officer Alexia Harrist, and interim director Stefan Johansson do not see this and

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and working together and with federal actors, constantly and repeatedly moved the goal posts.

251. As such, Petitioner A. Smith challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

252. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.

253. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announce to the public until the end of December doesn't mean it was "novel".

254. Petitioner A. Smith joins the other Petitioners and assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And she assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

255. Petitioner Laura Pavey is a citizen of Wyoming residing in Green River. She

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

is the mother of three children; two of which attend school in Sweetwater County school District #2 (SWCSD#2 hereinafter). The youngest, her daughter, (RP) attends Harrison Elementary and her son (VP) Lincoln Middle School. Petitioner Laura Pavey is also a substitute school teacher.

256. In April of 2020 the school was shut down and the students went online. As set forth in her affidavit, attached hereto as Exhibit 21, and incorporated herein as though set forth in full, Petitioner Pavey quickly learned that such "was next to impossible to complete." Such problems as network lagging or at times not even loading at all were constant. And neither the teachers nor the students were trained for online learning. And certainly not the parents. Petitioner Pavey was spending upwards of 10- 12 hours a day trying to complete their online learning - only to find out her youngest two were not even being graded. The online learning programs that were released were almost impossible to complete correctly and Petitioner Pavey and her children were becoming more and more frustrated. Eventually, Petitioner Pavey said no more. She did the minimum that was required and went to learning hands on at home. Even with her education and experience, the plan the district had laid out was not only tearing her family apart, but her children were stressed more than ever. Petitioner Pavey found that the children were growing more academically from her own plan at home than they were from the online schooling. During this school year, RP was a kindergartener, VP a 5th Grader and OP a Junior

(11th).

257. As expressed in her affidavit, when the 2020-2021 school year began in August, SWCSD#2 instituted its face covering policy. Petitioner Pavey prepared by purchasing more than $100.00 of masks. Within a week, both of her children had rashes on their faces. She began trying a variety of masks, but the rashes continued. She also observed that both children developed a pungent odor in their breathe. They also began losing their voice and developed a cough. Petitioner Pavey further observed that as each week began, the problems would get worse; but would improve over the weekend when the children weren't wearing any masks. This lasted the entire school year of 2020-2021; but when summer came they disappeared.

258. The 2020 Fall school year began with the mask policy in place. Her middle child VP would get headaches throughout the day. VP already suffered from stress induced migraine, and they were getting worse. Eventually, one of VP classes was removed so he could refocus and unmasked for a period and then returned to school. This seemed to help. This made Petitioner Pavey aware that VP's headaches might be coming from prolonged mask wearing. Petitioner Pavey substituted a lot in VP's school last year to help ease VP's stresses. Terrified of questioning what was happening to her children and the staff of the school, she stayed silent. Petitioner Pavey watched kids and staff all day wearing the masks improperly and at every opportunity they would have them off or

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

down.

259. Petitioner Pavey, concerned about how the mask were affecting the oral health of her children, took them to their dentist during the school year of 2020-2021. She was informed and provided information about how continuous mask wearing changes the bacteria in their mouths and that such can cause and/or aggravate gum disease and cavities. She was informed that the term "mask mouth" is used to describe what her children were experiencing. In addition to the health problems her children had developed, the teacher of her youngest RP, expressed concern with Petitioner Pavey daughter's learning. RP concerns arose as we notice her ability to retain information from one day to the next, her short term memory was being affected, RP speech started to regress, her articulation started to regress, she was confused at school, RP couldn't remember what RP did during the school day, he reading skills stunted.

260. By the end of the first quarter of the 2020-2021 school year Petitioner Pavey's daughter, who now was a first grader, was struggling in the classroom. Her daughter was getting forgetful, her articulation was regressing, and she was not acting herself. Petitioner Pavey spoke to her teacher, and found out that her teacher was noticing the same behavior. Site words she had memorized she no longer knew. By the end of the second quarter of the 2020-2021 school year Petitioner Pavey was pressing for answers and her teacher said she was pushing towards a BIT meeting within the school, but

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

needed evidence. Petitioner Pavey inquired as to whether her daughter could get speech therapy. Repeatedly, Petitioner Pavey asked for some type of intervention, but was repeatedly informed that she needed more documentation.

261. The second quarter of 2020-2021 Mrs. Montgomery RP's teacher and Mrs. Pavey began trying to find some type of intervention or help for her. RP audio problems combined with the mask policy, RP was having serious learning issues and becoming more and more frustrated. RP informed her mother that she couldn't understand what her teacher was saying and was getting confused. The situation deteriorated to a point that RP began regressing in her education.

262. As the months went on, each of her children struggled with either learning issues and/or health issues. And VP's increasing stress induced migraines was very taxing on his mental state. VP began expressing a concern with people seeing his face and Petitioner Pavey began to be concerned of what masking was doing to her children's mental health. By the end of the year Petitioner Pavey could no longer support the mask policy but put her children day in and day out for fear of what would happen if she didn't.

263. Petitioner Pavey sought medical attention for her daughter, but that presented other obstacles due to the Covid situation. Eventually her daughter had ear surgery to remove tubes and put a new set in (Feb of 2021). When things did not improve, Petitioner Pavey sought more medical attention for her daughter. It was

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

suggested that her daughter undergo an exploratory surgery to check and see if there was anything going on with her ears or vocal cords or her throat because shortly after birth she had laryngomalacia surgery. The medical professionals wanted to see if there was scaring or anything else going on. But in order to do the exploratory surgery her daughter would have to be Covid tested. By this time her daughter was hysterical about getting tested. It took almost several individuals to administer the test. The testing was becoming a traumatic event for her daughter. Petitioner Pavey was referred to an Audiology specialist after seeing nothing concerning anantomically. Eventually, Petitioner Pavey's daughter was diagnosed with Central Auditory Processing disorder, short term memory loss, phonological dyslexia, and ADHD. Multiple appointments from the months of July 2021-August 2021) In (July/August of 2021) RP was diagnosed with Central Auditory Processing Disorder. In short, RP relies on faces for understanding and retention." When facial expression and lip movements were taken away, RP brain went into overdrive trying to listen and hone in on what she was trying to listen to. For her whole life RP had been relying on looking at a person's face to retain information and what she was learning. In fact, Petitioner Pavey learned that a large part of retention for adolescents comes from watching facial expressions and reading a person's lips. Petitioner Pavey was informed by her Auditory specialist that around 60% of kids struggle when this is taken away. She also learned that many children who are diagnosed with ADHD in fact have an

Auditory Processing Disorder of some type and being able to see a face can combat this tremendously. Everything RP hears comes in with the same importance as all other things, so when she has a face to look at, RP is able to concentrate and retain much better. The masks created a barrier that is causing  short-term memory loss within her brain.

264. The 2021-2022 school year open with no masks but the school district had created a Smart Start Plan for the handling of Covid 19 within the school district. School began on August 18th of 2021. After having so many challenges from the previous years with RP and VP's health,  Mrs. Pavey chose to send them back to school without masks.

265. On September 21st of 2021, Petitioner Pavey received a call from the Harrison Elementary school nurse and was informed that her son VP at Lincoln middle school was contact traced and needed to be picked up from school immediately. The school nurse told Mrs. Pavey that the incident was confidential, and that she needed to get VP "immediately". This was not the nurse from her VP's school. Mrs. Pavey called the Lincoln school nurse, and she was confused on what was occurring, but said that if the other nurse had called her, VP needed to be picked up. Petitioner Pavey called VP's football coach and was informed that it was from the bus ride on the 18th of September 2021. Petitioner Pavey asked if it was just a suggestion, or if her son could return to school. The nurse did not know and informed Petitioner Pavey that she would need to ask the superintendent or the principals. The school nurse further informed Petitioner Pavey

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

that there was a document drawn up and she needed to come and get her son.

266. Petitioner Pavey followed up by calling the superintendent and was informed that her son could not return to school, and that if he did, he would be trespassing. Petitioner Pavey asked more questions like was she able to know when and where his exposure was. Petitioner Pavey was told that she is not entitled to such information. Petitioner Pavey then asked the superintendent about her rights as a parent. The superintendent became very upset and said: "You know what Mrs. Pavey I'm not sure if you are just any angry woman, but I'm not going to continue this with you." When Petitioner Pavey returned home, she learned that there was in fact, no papers at all. Petitioner Pavey then called and specifically asked for the documentation. After a few days, she received some information via email.

267. At this point, Petitioner Pavey began to educate herself on Covid and the school district's policies. Petitioner Pavey learned that things about the pandemic were not adding up. Petitioner Pavey was also becoming more concerned about both her children's education and her rights as a parent. The school was not providing an equal education to her son VP while he was quarantined. After reading the schools smart start plan, she learned that online education was only being offered to grades 9-12. Petitioner Pavey  contends that this is a violation of VP constitutional right to an equal education. Petitioner Pavey continued to advocate for RP's education. With documentation she

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

pursued intervention for RP's educational needs. School staff informed Petitioner Pavey that they needed their own documentation; documentation which Mrs. Pavey had been asking for the previous year. Now, suddenly, this year, they state that they need to do their own testing when RP had already been taken to a specialist. Repeatedly the school staff tried to convince Mrs. Pavey that she just needs a 504 and not an IEP. Without an IEP, RP cannot get programs in the school to support her educational development. Mrs. Pavey was jumping through hoops and calling the technology team to install her hearing aids to her chrome book which still is not hooked up correctly. They took a long time to connect the teacher's mic to her hearing aids and now when the class is reprimanded the raised voice goes directly into her ears. Mrs. Pavey asked if the school could get the reading programs to help her with her dyslexia and was told that "we will look into it." Petitioner Pavey has spoken with the speech specialist at the school of what she can do to help with her dyslexia, and the speech specialist says she is unsure but will look into it.

268. A meeting was scheduled with a team of educators that they call a BIT meeting. At RP's initial BIT meeting Mrs Pavey was told they needed to do their own testing now. Mrs. Pavey had paid thousands of dollars and made many claims to her insurance to figure out was happening to RP and now they need to do their own test. RP's primary care physician says that she does not see the ADHD and neither does her Audiologist. The only thing they seemed to be concerned with in RP's BIT meeting was

her ADHD that the neurologist stated in his report.

269. When Mrs. Pavey requested they pull down their mask to help make sure RP was understanding she was made to feel like she was asking something too much of them. When Mrs. Pavey would ask if her teacher would pull down their masks to speak to RP, she was treated like she was just an anti-masker. Her teacher did not even attend the parent-teacher conference. Mrs. Pavey was the one to inform her teacher that the meeting had already taken place.

270. As a result of the above events, Petitioner Pavey could no longer support any face covering policy. Mrs. Pavey wrote a letter into the superintendent and the board members as she became more concerned of RP equal education that she is supposed to be provided. This is not being taken care of and Petitioner Pavey wrote a letter pleading her case. In this email Petitioner Pavey expressed her concerns she had heard from ENTs and Audiology Specialists; that they have seen effects in children's lung development. They indicated to us to make sure she is doing breathing exercises throughout the day to keep her lungs strong and to make sure she is using her diaphragm. They have seen as a side effect of the masks that children are not breathing as deeply when wearing masks.

271. RP received her 1st of what could be possibly many contact trace quarantines issued by the school. On October 6th of 2021 RP's school nurse called while Petitioner Pavey was student teaching down the hall in a kindergarten classroom. Mrs.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Pavey was told to that RP needed to immediately leave the building and that RP could return on the 12th day.

272. Mrs. Pavey went down to get RPS, and noticed that RP was not in the office. So she walked down to her classroom and opened the door. Mrs. Pavey saw RP sitting on the floor in a large group with all the classmates. Mrs. Pavey told RP needed to come with her and the substitute in the classroom was unaware that she was even being sent home. Upon escorting RP out, Mrs. Pavey walked past the office again and informed the staff that she had RP and that we were leaving. The office personnel handed Mrs. Pavey papers instructing Mrs. Pavey of what she could and couldn't do with her child and when RP could return to school. Mrs. Pavey learned from the paperwork that RP was exposed the Thursday and Friday before and she was already into her contact exposure 3 days.

273. Mrs. Pavey was left in an uncomfortable circumstance having to wear two hats in the school; one as a parent; and one as an educator who was currently in the school student teaching, Mrs. Pavey thought the best course of action was to email the nurse, principal, superintendent, and secretary from her personal email once she arrived home to ask questions. Mrs. Pavey did just that. Mrs. Pavey emailed them in a group and asked when, where and at what time of RP's exposure occurred. The response was:

"the event was a positive COVID case in the classroom where your daughter

(RP) spends most of her day. A close contact is within 6 feet for more than 15 minutes in a 24-hour period. As you know, we have large classrooms and are not able to keep desks 6 feet apart. Masks are not mandated this year so if students are not wearing a mask and there is a positive case in the class those who are in close contact will be sent home to quarantine. As I explained on the phone the last day of contact was on 10/1. Your student should quarantine through 10/11 and if no symptoms may return to school 10/12. The paperwork I sent home has other testing options as well along with dates for her quarantine period."

274. There was no documentation ever sent. Petitioner Pavey was sent four documents from Alexia Harrist. Within these documents Mrs. Pavey found major discrepancies along with discrepancies to their smart start plan. Mrs. Pavey attended the board meeting and tried to talk and ask following questions; but was cut short and was yelled at by one of the board members who stated that they were not following Harrist plans, and he doesn't know where Mrs. Pavey received such information. Mrs. Pavey told him this was the information that was provided by the school nurse. Points 1-10 are the points and questions to them:

1. Why were parents not provided the Covid-19 School Exclusion Flowchart from Alexia Harrist 10.2021- Within this document it indicates that a mask shall be placed on the individual (was consent to do this to a minor given) It states to recommend or perform testing (what does testing mean and again was consent given)

2. The investigation: K-12 Setting document from Alexia Harrist is concerning also Investigation by definition is, a formal inquiry or systematic study (do you have consent from parents to allow our children to be part of this study.) Why was this not made public to parents as well?

3. The K-12 Contact Tracing Guidance from Alexia Harrist and the State of

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Wyoming Department of Health Dated October 1, 2021. In this document it states: to be excluded from school during the period when they may become infectious to others. Schools are not supposed to exclude children. In addition, it states, an individual is considered a close contact if they were within 6 feet of the infectious individual for 15 minutes or more during the course of a 24hour period. (My daughter's school nurse said this was how she was determining my daughters contact exposure) When did this change from 15 min to 24 hours? And why weren't parents made aware? (this is actually a study that is taking place as I will indicate later) Think about what this means? With this definition even more students will be quarantined and missing school! We cannot compare last year's numbers to this year's numbers when we have changed a major variable of how we are conducting our contact tracing. Why was this document not provided to parents when it directly affects each child? This document was also sent to me by the school nurse and she indicated this is how they are making the determination of contact tracing.

4. I did some research and found that the CDC website indicates this type of isolation has been titled Considerations for Case Investigation and Contact Tracing in K-12 schools and Institutions of Higher Education. Investigation by definition is a formal inquiry or systematic study. Once again, was permission given for our children to be part of this study. Your Smart Start Plan indicates 15 min exposure with no time frame listed. Why is the district straying from the plan that they put in place?

5. Smart Start Plan- Why does it say within the plan that, someone can come in and randomly perform temperature checks and screenings may be conducted on students and staff with symptoms or a temperature of 100.4 F will be sent home.

6. This point is extremely concerning to me when Steve Core, a school board member, stated that you are not following Alexia Harrist. The Letter that was sent out to the Superintendent and Board Members from Alexia Harrist dated 10-1-2021. In this letter states "that it has come to our attention that there may be some confusion with regard to the school districts issuing quarantine recommendations on behalf of the WDH. In an effort to reduce confusion, we are providing updated templates that can be used by schools on school district letterhead for individuals that should stay home FROM SCHOOL due to a diagnosis of, or an exposure to, COVID-19. We have updated the language in this template to reflect that the school districts would be issuing directives to students to stay home from school if they have been exposed to COVID-19. The letters you are sending out are not on a

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

school letterhead. As of the 4th of October these quarantine orders were still being given in our school district. Are you still using these papers? Then the letter goes on to say: "Importantly, while schools are tasked with providing a safe and secure environment, the WDH, is tasked with the responsibility of issuing quarantine and isolation orders. The WDH will issue those orders when necessary to support school efforts to maintain a safe learning environment, as has been the case throughout the pandemic." I wonder why children are being quarantined and contact traced within the school, as it should be WDH performing this? These are not isolation orders, they are a suggestion/recommenda-tions from the schools. Why does the letter state being sent home for our children stating that: "Your child can (can in this context by definition means be permitted to) go outside on your property and exercise outdoors as long as he or she doesn't have close contact with others and refrains from using public facilities such as water fountains and restrooms. Your student may leave home to seek medical care, including to be tested for COVID-19" When were our rights taken away and given to the district to make medical decisions for our children. Article 1 § 38 of the State of Wyoming Constitution protects us and our children's rights for us to make these decisions. Why haven't parents been made knowledgeable of this document? This is one reason parents' concerns are coming into play to persuade parents into making no other choice than to mask their child so they can stay in school.

7. Have you put research into both sides of the effects of masks on children so you can form an unbiased decision? Have you put research into both sides of all the isolation effects on children? Have you called all the other districts in Wyoming to see what is working for them? Are you doing your own individual research or are you taking what you are being told at face value? Have you contacted or sent out emails, text to parents to see their stance on it? Have you connected with all the teachers?

8. DATA- Where are the numbers of cases that come up when kids are "exposed"? If it is less than 15% then why do we keep quarantining instead of figuring a different option? When we are talking about 15% these talks about in the smart start plan per school. Last week your 7.92 % was based on the total of the schools entirely. This is skewing the numbers. What is the percentages based off each school per the Smart Start Plan?

9. The Smart Start Plan indicates on page 4 that you are only offering limited off campus learning opportunities and that is only for students in grades 9-12. Even

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

though the Smart Start Plan indicated on page 3 that the plan is based on a principle to maintain a high level of expectations for the educational opportunity being provided to all students of the district. This does not offer each child an equal education as Stated in the Wyoming Constitution. The Smart Start Plan indicates parents should stay informed through differing communication modes, if you are not providing communication how can parents stay informed.

10. For this entire time through COVID-19 it has been preached that my mask protects you not me. So now why are kids allowed to stay in school if they mask up. Now the mask protects them to stay in school and not get contact quarantined? This is another reason parents feel they have no other option but to mask their children because they need to work, and they want their children to get an education. Also, If people who are vaccinated can still get the virus and spread the virus why are they given the perk to not get quarantined? The purpose of the vaccine is to have milder symptoms and not prevent covid. A person with covid may have no symptoms of covid and stay in school, while a non-vaccinated child may also carry covid and have zero symptoms but must be isolated at home? This is where parents are feeling manipulated and persuaded to vaccinate or mask. We talk about coming together but these judgments and decisions you are making are dividing person against person, student against student, non-vaccinated against vaccinated, masked vs unmasked, taxpayer against taxpayer. Your policies are putting people of different views against one another when we used to be a community that celebrated one another's differences in every aspect of our humanity. The policies are putting teachers against teachers. We are told to respect one another for our religious beliefs, heritage, affiliations, and so much more. Why are we not being respected for our views on our medical freedoms? If the vaccine is intended to protect the ones who decide to be vaccinated, then let the others have their choice on their medical freedom. It is not the School Districts.

275. Petitioner Pavey did not receive any response from the board or the superintendent. Petitioner Pavey contends and alleges that her children are being discriminated against because she has chosen to exercise her parental rights over both educational and medical issues of her children. Petitioner Pavey contends and alleges that the unequal treatments is in violation of numerous State and federal statutes and

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

constitutional rights protected by both the State and federal constitutions. This is not equal education when there was a minimal effort given to RP and VP as they spent their forced time at home.

276. Now each day RP feels and sees the unequal treatment of those who are masked and those who are not. RP an VP see perks for those who give up their liberties and go against their morals and what their bodies are telling them to do. Their natural instincts kick in and without knowing it they are pulling down their masks. Mrs. Pavey have suffered enough as has her children for this so-called outbreak. The statics are blatant; the fatalities are nil with a extremely high recovery rate for those very few children in RP and VP's age group. Petitioner Pavey contends and alleges that the respondents are playing political games and parents and the children are paying the price. Petitioner Pavey could no longer support a system or government that is creating so much psychological, mental and educational damage to her children. To that end, she began educating herself on everything she could about Covid_19.

277. As such, Petitioner Pavey contends and alleges that the many and repeated violations of constitutional provisions, federal and State statutes are directly attributed to and commenced by Respondent Gordon's Declaration of Emergency based upon the faulty and unsound application and use of W.S. § 35-4-115(a)(i). The many and repeated violations were and have been maintained and continue by the out-right unlawful actions

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

of the rest of the Respondents working together and separately and by the fallacious, deceitful and fraudulent use of the PCR test.

278. Petitioner Pavey further contends and alleges that the decision to declare a state of emergency and the continuation of said emergency was not and has never been based upon any creditable scientific or medical factual foundation. From the first declaration of Respondent Gordon on March 13, 2020, to the decisions and mandates requiring testing, masking and quarantines of healthy citizens, and the six foot distancing mandates, have all been arbitrarily decisions without legal or scientific foundation which have directly and indirectly resulted in the many and repeated violations of Petitioner Pavey's rights.

279. Petitioner Pavey asserts and alleges that in addition to other rights violations, district and school personnel have and continue to not only intentionally ignore the equal protection of the 14th amendment of the United States Constitution, but maintain an environment of treating students differently based upon medical conditions and/or religious beliefs.

280. Moreover and in addition to the unlawful activities of the Respondents, working together and separately, Petitioner Pavey **directly challenges as unConstitutional**, as it is being applied and as blatantly overboard, the last sentence of W.S. § 35-4-115(a)(i) which states: "The governor shall declare when a public health

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

*emergency* exists or has ended."

281. Under the ***guise*** of a public health *emergenc*y, Respondent Gordon has made

it public that:

> "The state of emergency declared for Wyoming last year because of the coronavirus pandemic <u>needs to continue</u> ***to allow the state to take advantage of certain federal programs*** . . ." (emphasis added; See FN 59 supra)

The "programs" referred to are all funding programs. In the words of Respondent

Gordon's spokesman, Michael Pearlman:

> "One that that's important to keep in mind is that many of (the Federal Emergency Management Agency's) ***policies*** regarding COVID-19 ***cost reimbursement*** <u>**are based upon the existence of a public health emergency**</u>," . . . "So there would be *financial consequences* to the state were the governor to lift the state of emergency." (emphasis added) (emphasis added; See FN 60 supra)

282. This ***non***-health excuse was set forth in response to Fremont County

Commissioners attempt to end the emergency declaration based upon and citing "steady

declines in coronavirus cases seen in the past several months."

283. Petitioner Pavey contends and asserts that the purpose of W.S. § 35-4-115(a)

(i) is to address a real and meaningful "Public health emergency"; **NOT any funding**

**issue** that may or may not actually exist. This is especially true when the alleged funding

issues were the result of the unlawful activities of the Respondents upon their own and

working in conjunction with various actors at the federal level. Petitioner Leimback

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

asserts that W.S. § 35-4-115(a)(i) is designed and intended as an **extraordinary tool** to be used sparingly during a time of ***unexpected*** extraordinary health crisis.

284. Petitioner Pavey asserts that the legislative intent is of ***a temporary nature***. From the beginning it was made clear that the March 13, 2020 EO declaration was for the temporary purpose of "flattening the curve" of the Covid-19 virus. The time frame of "2 weeks" and "14 days" was repeatedly mentioned. The "flattening the curve" excuse and the temporary "2 weeks" time frame has morphed into a funding measure which, according the Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson, **may continue as long as they want** despite the fact that NO **extraordinary** health emergency condition exist in the State of Wyoming.

285. Wyoming § 35-4-115(a)(i) states: "Public health emergency" (quote in original). The very term "emergency" means:

1. a sudden, urgent, ***usually unexpected*** occurrence or occasion requiring immediate action.

2. a state, especially of need for help or relief, created by some ***unexpected*** event. (emphasis added)  https://www.dictionary.com/browse/emergency

289. The Cambridge dictionary defines emergency as:

something dangerous or serious, such as an accident, that happens ***suddenly*** or ***unexpectedly*** and needs fast action in order to avoid harmful results. (emphasis added) https://dictionary.cambridge.org/us/dictionary/english/emergency

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

286. Petitioner Pavey asserts that Wyoming § 35-4-115(a)(i) – when read properly - states:

> "Public health emergency" means an [*unexpectedly*] occurrence or [*unexpectedly*] imminent threat of an illness or health condition caused by an [*unexpectedly*] epidemic or [*unexpectedly*] pandemic disease, a novel and highly fatal infectious agent or a biological toxin that poses a substantial risk of a significant number of human fatalities or incidents of permanent or long-term disability. The governor shall declare when a public health emergency exists or has ended."

287. Petitioner Pavey asserts that a normal reading of "The governor shall declare when a public health "*emergency*" exists or has ended." would be understood that a limitation is built into such a statement; in this case, a true scientific factually creditable medical health **emergency**; an EXTRAORDINARY health crisis; and that such authority ends *automatically* when the "crisis/emergency" no longer exist. When no true scientific factually creditable medical health emergency exist, the authority granted by W.S. § 35-4-115(a)(i) can no longer exist.

288. It is clear that Respondents Gordon,  the Wyoming Dept. of Health, State health officer Alexia Harrist, and interim director Stefan Johansson do not see this and believe that they can continue and maintain a state of emergency,  literally,  **as long as they choose** using any excuse such as "funding". The Respondents have, individually and working together and with federal actors, constantly and repeatedly moved the goal posts. And to support their repeated and constant moving of the goal post, they have relied

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

upon:

1. The deceitful use of meaningless PCR testing.

2. Absurd and meaningless numbers presented to the public without any meaningful context.

3. A bogus and deceitful accounting process that is intended to mislead the public.[86]

4. A bogus and deceitful marketing[87] campaign *designed* to scare the public into believing that Covid-19 is as bad or worse than the black plague.

5. Withholding vital information from the public such as the number of cycles that the PCR is being run at.

289. As such, Petitioner Pavey challenges the constitutionally of the last sentence of W.S. § 35-4-115(a)(i) both as it is being applied and as blatantly overbroad.

290. Additionally, it cannot be said Covid-19 was "novel" on March 13th, 2020. Enough was known about Covid-19 that a patent for a Covid-19 test was filed in 2015; and again in 2017.

291. Furthermore, even if it could be said that Covid-19 was novel at the time of Respondent Gordon's EO declaring a state of emergency, it cannot be said that it is novel 18 months later. Enough was known about Covid-19 in 2015 for a patent for Covid-19 test to be filed; And again in 2017. In short, the Covid-19 virus was quietly being worked on with many attempts at manipulating it over a period of several years. Just because it wasn't announce to the public until the end of December doesn't mean it was "novel".

---

86  See Footnote 5 supra
87  See Footnote 62 supra

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

292. Petitioner Pavey joins the other Petitioners and assert that regardless of which of the many angles one looks at Covid-19, every "emergency" has an end point. And she assert that any "emergency" that might have existed on March 13, 2020 has long since passed.

## Defendants

293. Respondent Gordon is the Governor of the State of Wyoming. Respondent Wyoming Dept. of Health is a department of the State of Wyoming. Respondent Stefan Johansson is current interim director Wyoming Dept. of Health. Respondent Alexia Harrist MD is the State health officer for the State of Wyoming.

294. The remaining Respondents are: Superintendent Craig Dougherty and Trustees, of Sheridan County School District#2; Superintendent Jubal Yennie and Trustees of Albany County School District#1; Superintendent Ryan Kramer and Trustees of Goshen County School District#1; Superintendent Dr. Margaret Crespo and Trustees of, Laramie County School District #1; Superintendent Craig Barringer and and Trustees of Sweetwater County School District #2; Superintendent: Kent Stokes and Trustees of Uinta County School District#4; the Sheridan Municipal Police Depart, and each of the following health officers in their official capacity for the respective counties: Albany: Jean Allais MD., Goshen: Ted Church, MD., Johnson: Mark Schueler MD, Laramie: Stanley Hartman MD, Sweetwater: Jean Stachon, MD, and Jane/John Does 1-100 as

identified.

295. Furthermore, the State of Wyoming, the Wyoming dept of Health, the school districts and schools are all recipients of federal funding.

## RELIEF SOUGHT

### FIRST CLAIM FOR RELIEF

296. Plaintiff incorporates herein, as though set forth in full, paragraphs 1-XX for all CLAIMS FOR RELIEF.

297. The Petitioners move this Court to issue a Declaratory judgment declaring that the intent of the  terms  "epidemic" and "pandemic", as used in Wyoming Stat § 35-4-115(a)(i), are used and understood at the time the statute was written, and thus, must be interpreted and applied as medically, scientifically and historically understood and known.

### SECOND CLAIM FOR RELIEF

298. Wherefore, based upon the foregoing, the Petitioners move this Court to issue a Declaratory judgment declaring that there is not currently, and never was, any legitimate creditable information or documentation to believe that there was any "imminent threat" to the citizens of Wyoming that was "caused by an epidemic or pandemic disease" as those terms are used and understood medically, scientifically and historically.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

THIRD CLAIM FOR RELIEF

299. The Petitioners, excluding Grace and Andy Smith, move this Court to issue a Declaratory judgment declaring that the Covid-19 virus known as SARS-CoV-2 has been known about and manipulated since at least 2015; and therefore, is not a new or novel virus. Furthermore, these Petitioners move this Court to issue a Declaratory judgment declaring that Covid-19 is a mutation of a corona virus. These Petitioners further move this Court to issue a Declaratory judgment declaring that the medical community world wide and certainly in Wyoming and throughout America, has been successfully treating carona viruses with known well established treatments following standard medical practices and procedures. Lastly, That the Covid virus was never and has never and is not a virus "that poses a **substantial risk** of a **significant number** of **human fatalities** or incidents of permanent or long-term disability".

FOURTH CLAIM FOR RELIEF

300. Wherefore, based upon the foregoing, the Petitioners move this Court to issue a Declaratory judgment declaring that Respondent Gordon's Executive Orders of March 13th, 2020 to present, are without statutory authority; and thus, null and void.

FIFTH CLAIM FOR RELIEF

301. Alternatively, the Petitioners moves this Court to issue a Declaratory judgment declaring that, even if there was such an "emergency" that did meet the criteria

of Wyoming Stat § 35-4-115(a)(i) on March 13, 2020, that the statutory authority ends

***automatically*** when the "crisis/emergency" no longer exist. The Petitioners further move

this Court to issue a Declaratory judgment declaring that the conditions necessary to meet

the criteria of Wyoming Stat § 35-4-115(a)(i) do not currently exist.  Additionally, the

Petitioners further move this Court to issue a Declaratory judgment declaring that the last

sentence of Wyoming Stat § 35-4-115(a)(i) is unconstitutionally overly broad both on its

face and as it is being applied by Respondent Gordon and the officers, agents, employees,

and all other persons in active concert or participation with them.

### SIXTH CLAIM FOR RELIEF

302. The Petitioners move this Court to issue a Declaratory judgment declaring

that neither school district trustees, nor any school administrator, staff, employees, or

personnel have authority to make medical determinations or diagnoses.

### SEVENTH CLAIM FOR RELIEF

303. The Petitioners move this Court to issue a Declaratory judgment declaring

that Wyoming Stat § 35-4-115(a)(i) does not grant unconditional authority to totally and

completely set aside and/or ignore other State and federal statues and/or provisions of the

federal or Wyoming Constitutions. Additionally, the Petitioners move this Court to issue a

Declaratory judgment declaring specifically that adults and parents/guardians have the

Right to make medical decisions as is secured in Article 1 § 38 of the Wyoming

Constitution and W.S. § 14-2-206.

304. The Petitioners further move this Court to issue a Declaratory judgment declaring that protection of religious beliefs do not disappear and are not abolished even during a true and meaningful health emergency.

## EIGHTH CLAIM FOR RELIEF

305. The Petitioners, excluding Andy and Grace Smith, move this Court to issue a Declaratory judgment declaring that there are fatal flaws in using the PCR as a diagnostic tool such as:

1) The PCR IS NOT, and was never intended to be used as a diagnostic tool as evidenced by the designer of the test.

2) The PCR testing is being misused and manipulated to produce as many positive results as possible.

3) The PCR does not actually isolate the Covid-19 virus from other viruses; corona or otherwise.

4) Thus, the PCR does not actually test for the Covid-19 virus. Therefore it is meaningless and fraudulent to say someone has the Covid-19 virus based upon the results of a PCR test.

5) The PCR is not a true test as it is easily manipulatable.

## NINTH CLAIM FOR RELIEF

306. The Petitioners move this Court to issue a Declaratory judgment declaring that the Court to issue a Declaratory judgment declaring that masking, social distancing, testing and/or the quarantining for all students, teachers, staff and visitors is

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

unconstitutional for the following reasons:

1) There is no medical emergency that justifies the use of the Respondents' policies requirements/mandates as it applies students, teachers, staff and visitors.

2) The remedy requiring the use of face-coverings, social distancing, testing or the quarantining for all students, teachers, staff and visitors does not accomplish the stated goal.

3) The Respondents' policies requirements/mandates regarding the use of face-coverings does not accomplish a governmental interest.

4) The remedy requiring the use of face-coverings, social distancing, testing or the quarantining for all students, teachers, staff and visitors, are, and have been arbitrarily made and enforced without any creditable basis in science.

5) The remedy requiring the use of face-coverings, social distancing, testing or the quarantining are violations of constitutionally secured and protected fundamental rights as those policies/mandates are being applied.

5) Health emergencies do not warrant coercion that is indiscriminate, overbroad, excessive, or without creditable evidentiary support. The Respondents' policy requirements/mandates regarding the use of face-coverings, social distancing, testing or the quarantining of healthy and asymptomatic individuals is not based on the best available creditable scientific evidence.

## TENTH CLAIM FOR RELIEF

307. The Petitioners move this Court to issue a Declaratory judgment declaring that Wyoming Stat § 35-4-115(a)(i) is not a funding statute; but rather, is meant to address an actual "health emergency". Furthermore, the Petitioners move this Court to issue a Declaratory judgment declaring that any funding issues related to Covid-19 were caused by the unlawful, unconstitutional and unnecessary actions of Respondents Gordon, Wyoming dept of Health, the director and State health officer.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

## ELEVENTH CLAIM FOR RELIEF

308. Wherefore, based upon the foregoing, the Petitioners move this Court to issue a preliminary injunction against the Respondents from applying, enforcing, or compelling any policy, requirement, and/or mandate toward any of the Petitioners, their children, school staff, employees, visitors, or toward others similarity situated. The Petitioners therefore move this Court to makes its injunctive relief effective Statewide.

## TWELFTH CLAIM FOR RELIEF

309. The Petitioners further move the Court to award additional relief as the Court deems necessary to prohibit and/or deter any and all of the Respondents from acting outside of proper statutory and/or constitutional authority.

## THIRTEENTH CLAIM FOR RELIEF

310. Petitioners further moves the Court to award reasonable costs and attorney's fees, and such other relief as the Court deems necessary to prohibit and/or deter any and all of the Respondents from acting outside of proper statutory and/or constitutional authority.

## FOURTEENTH CLAIM FOR RELIEF

311. The Petitioners move the Court to set a jury trial date to determine the Petitioners' cause of action of fraud.

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief

Submitted this _____ day of November, 2021.


ss_____

Nick Beduhn WSB# 6-3763
P.O. Box 1149
Buffalo, WY 82834
307-899-2338
nick.freedomfighter@gmail.com

Shelta v Gordon - Complaint For Declaratory Judgment And Injunctive Relief